## INTERSTATE COMMERCE COMMISSION *v.* DELAWARE, LACKAWANNA & WESTERN RAILROAD COMPANY.

### APPEAL FROM THE CIRCUIT COURT OF THE UNITED STATES FOR THE SOUTHERN DISTRICT OF NEW YORK.

No. 325.   Argued February 25, 28, 1910.—Decided April 3, 1911.

The conclusions of the Interstate Commerce Commission on questions of fact are not reviewable by the courts. *Balt. & Ohio R. R. Co.* v. *Pitcairn*, 215 U. S. 481.

A carrier cannot make mere ownership of goods tendered for transportation the test of the duty to carry, nor may a carrier discriminate in fixing charges for carriage upon such ownership.

Under the act to regulate commerce a carrier cannot refuse to transport carload lots at carload rates because the goods do not actually belong to one shipper or are shipped by a forwarding agency for account of others.

The provisions of § 2 of the act to regulate commerce, were substantially taken from § 90, the equality clause of the English Railway Clauses Consolidated Act of 1845, and had been construed by the courts prior to the enactment of § 2 as forbidding a higher charge to forwarding agents than to others.

The right of the carrier to fix rates does not give it the right to discriminate as to those who can avail of them.

The conclusion by the Interstate Commerce Commission that the enforcement of a rule by a carrier creates a discrimination is one of fact and not open to review by the courts.

In the absence of statutory authority to exclude forwarding agents from availing of published rates the courts cannot overrule a conclusion of the Interstate Commerce Commission that such exclusion would create a preference; and this although the business of forwarding agents be competitive with the carrier itself.

The facts are stated in the opinion.

*Mr. Wade H. Ellis,* assistant to the Attorney General, with whom *Mr. P. J. Farrell* and *Mr. Edwin P. Grosvenor* were on the brief, for appellant Interstate Commerce Commission:

The power exercised by the Commission in this case

was within the authority conferred by the Hepburn Act
of June 29, 1906, 34 Stat. 584, §§ 2, 13, 15. The Circuit
Court rendered no opinion beyond stating that a majority
of the court were in accord with the reasoning expressed
in the dissenting opinion of the chairman of the Commis-
sion. This dissenting opinion challenged merely the ex-
pediency of the order. But the order being "within the
scope of the delegated authority under which it purports
to have been made," the question of the expediency was
not for the court to pass upon.. *Interstate Commerce Com-
mission* v. *Illinois Central R. R. Co.*, 215 U. S. 452. See
also *Honolulu Rapid Transit Co.* v. *Hawaii*, 211 U. S.
282; *Knoxville* v. *Water Co.*, 212 U. S. 1, 8, 18; *Prentis* v.
*Atlantic Coast Line Co.*, 211 U. S. 210; *Willcox* v. *Con-
solidated Gas Co.*, 212 U. S. 19, 41; *San Diego Land Co.* v.
*National City*, 174 U. S. 739; *Reagan* v. *Farmers' L. & T.
Co.*, 154 U. S. 362, 397.

The Commission ordered the defendants to cease from
refusing to apply their carload rates to carload lots con-
sisting of packages of various ownership tendered as a
single shipment by one consignor to one consignee, and to
desist from making ownership or lack of ownership of
property tendered for shipment a test as to the applica-
bility of a carrier's rates, because by such practices they
were discriminating "in the transportation of a like kind
of traffic under substantially similar circumstances and
conditions." The Commission did not err in holding that
the words "similar circumstances and conditions" refer
to matters of carriage and that the ownership of the prop-
erty transported is not a fact to be taken into considera-
tion. *Wight* v. *United States*, 167 U. S. 512, 518; *Inter-
state Commerce Commission* v. *Alabama Midland Ry. Co.*,
168 U. S. 144, 166.

Section 2 was passed to prevent the same discrimination
prohibited by § 90 of the English act, known as the
"Equality Clause," and this court will presume that

Congress in adopting the language of the English act had in mind the construction given to that act by the English courts.   *Texas & Pacific Ry. Co.* v. *Interstate Commerce Commission,* 162 U. S. 197; *Interstate Commerce Commission* v. *Baltimore & Ohio Ry. Co.,* 145 U. S. 263; *McDonald* v. *Hovey,* 110 U. S. 619.   The construction of the English courts is the same as that here contended for. *Great Western Ry. Co.* v. *Sutton,* L. R. 4 H. L. 226; *Evershed* v. *London & Northwestern Ry. Co.,* 3 App. Cas. 1029; *Denaby Main Colliery Co.* v. *Manchester, Sheffield & Lincolnshire Ry. Co.,* 11 App. Cas. 97.

One who is rightfully in possession of personal property, with authority to ship it in his own name, is a person within the meaning of § 2.   *United States* v. *Mil. Refrigerator Transit Co.,* 145 Fed. Rep. 1007.

A carrier may not properly look beyond the transportation to the ownership of the traffic as a basis for determining the applicability of its rates.   If this court should hold that § 2 applies only where either the consignor or the consignee is the actual owner of all the goods included in the shipment, the carrier would be free to practice much discrimination which could otherwise be prevented. If such holding were made it is apparent that the application of § 2 would depend not upon the language used by Congress but upon the will of the carrier to whom the shipment might be tendered for transportation.

The function of a railroad is merely to transport, and it was not contemplated that the railroad should be concerned with what happens before or after transportation.

*Mr. Mazzini Slusser* for an appellant shipper submitted.

*Mr. Walker D. Hines,* with whom *Mr. William S. Jenney* was on the brief, for appellees:

The Commission erroneously held that § 2 of the act

requires the same duties to forwarding agents as to the shipping public.

The differential between the carload and less than carload rates is of legal interest to the shipper, but not to the forwarding agent. As to the latter the differential is a mere accident.

Loading, unloading, billing and accounting, respecting less than carload services (which the forwarding agent seeks to perform), are part of the transportation service and at common law the carrier has the right to exclude others from performing such services in competition with it. Similar cases are: *Chicago &c. R. R. Co.* v. *Pullman Southern Car Co.*, 139 U. S. 79; *Central Stock Yards Co.* v. *Louisville & Nashville Ry. Co.*, 118 Fed. Rep. 113; *Lundquist* v. *Grand Trunk Western Ry. Co.*, 121 Fed. Rep. 915; *Johnson* v. *Dominion Express Co.*, 28 Ontario Reports, 203.

Fundamentally the same doctrine was applied by the *Express Cases*, 117 U. S. 1. The English doctrine to the contrary has no bearing, because squarely in conflict with the common-law doctrine in this country as declared in the *Express Cases*. Hutchinson on Carriers, §§ 514–517.

The act to regulate commerce has not changed the common law in this respect. *Baltimore & Ohio Ry. Co.* v. *Voight*, 176 U. S. 498, 509.

The act to regulate commerce seeks to secure equality between shippers. *United States* v. *Wight*, 167 U. S. 512, 518; *Texas & Pacific Ry. Co.* v. *Interstate Commerce Commission*, 162 U. S. 197, 219; *Brownell* v. *C. & C. M. Ry. Co.*, 4 I. C. C. Rep. 285, 292. The forwarding agent is not the real shipper, and his interest in the shipment is analogous to that of the railroad company.

The Commission erroneously construed § 2 to exclude from consideration all differentiating elements except circumstances pertaining to the character of the goods and the destination.

Not even the English cases sustain this view of the English equality clause.

But the English cases do not control the construction of § 2 of our act, because this section was not taken from the English act, but is radically different and has been given a radically different construction by this court. *Interstate Commerce Commission* v. *Baltimore & Ohio Ry. Co.*, 43 Fed. Rep. 37, 44, 46, 47, 49, 54, 59, 61; *S. C.*, 145 U. S. 276, 280, 282, 283; *Texas & Pacific Ry. Co.* v. *Interstate Commerce Commission*, 162 U. S. 217, 218, 219. A comparison of these cases with *Phipps* v. *London & Northwestern Ry. Co.*, L. R. 2 Q. B. D. 229, 249, shows the extraordinary contrast between this court's liberal construction of § 2 and the narrow construction placed by the English courts upon their equality clause. The English cases have never been approved or followed in this country as to § 2. *United States* v. *Wight*, 167 U. S. 512, and *Interstate Commerce Commission* v. *Alabama Midland Ry. Co.*, 168 U. S. 144, are entirely consistent with the liberal construction of § 2 adopted by this court.

The Commission's construction of § 2 is in irreconcilable conflict with this court's repeated declarations as to the spirit and purpose of the act to regulate commerce. *C., N. O. & T. P. Ry. Co.* v. *Interstate Commerce Commission*, 162 U. S. 184, 197; *Interstate Commerce Commission* v. *Alabama Midland Ry. Co.*, 168 U. S. 144, 172; *Southern Pacific Ry. Co.* v. *Interstate Commerce Commission*, 200 U. S. 536, 554; *Interstate Commerce Commission* v. *Chicago Great Western Ry. Co.*, 209 U. S. 108, 119.

The adoption of the Commission's erroneous construction of § 2 would destroy many traffic arrangements of great importance to the public.

The Commission's order was unlawful because it rested upon an erroneous construction of § 2, under which erroneous construction the Commission absolutely excluded from consideration the factors which the carriers pre-

sented and which, under the statute and the decisions, the carriers were entitled to have the Commission consider.

MR. CHIEF JUSTICE WHITE delivered the opinion of the court.

Was the court below wrong in permanently enjoining the enforcement of an order of the Interstate Commerce Commission directed to the railroad companies who are appellees, is the subject which this cause requires us to consider. As a preliminary to stating the proceedings before the Commission and the court, we refer to practices under the act to regulate commerce which gave rise to and developed the controversy with which the order of the Commission was concerned. To do this will not only abbreviate the statement of the case, but will serve to broadly define the one question essential to be decided and point to the principles applicable to its correct solution.

Before the act to regulate commerce it was usual, first, to give reduced rates to persons who shipped quantities of merchandise; and, second, to charge a proportionately less rate for a carload than was asked for a shipment in less than a carload. After the act lower rates to wholesale shippers were abandoned, it having been declared that to continue them was contrary to the act. *Providence Coal Case,* 1 I. C. C. Rep. 107. The giving, however, a lesser proportional rate for a carload than for a less than carload continued, the Commission having at an early date announced that such a practise was not prohibited. *Thurber v. N. Y. C. & H. R. R. Co. et al.,* 3 I. C. C. Rep. 473. Without detailing the theory upon which this conception was based it suffices broadly to say that it embodied the assumption that a carload was the unit of shipment, and rested upon the difference which existed between the cost of service in the case of a carload ship-

ment by one consignor to one consignee and that occasioned by a shipment in one car of many packages by various consignors to various consignees. Leaving aside possible qualifications arising from exceptional conditions, it is true to say that the Commission, however, recognized that the fixing of a lesser rate for a carload was not imperative, but was merely optional. Conformably to these administrative conceptions it came universally to pass that wherever a lesser charge for a carload than for a less than carload shipment was established such charge was only applicable to shipments made at one time by one consignor of merchandise consigned to one consignee at a single destination. While there was this uniformity there was, however, much divergence between carriers as to the character of traffic which was given the benefit of the lesser rate for carload shipments and the circumstances under which, when such rate was established, it would be applied. This becomes at once manifest when the rules are considered which prevails in the three geographical divisions into which the United States came to be divided by carriers in order that a similar classification might, in a general sense, obtain under like conditions. The divisions in question are the Southern, the Western and the Official Classification territory, the first including practically all points east of the Mississippi River and south of the Ohio and Potomac Rivers; the second embracing that part of the country west of the Mississippi River and the Great Lakes and an imaginary line extending from St. Louis to Chicago, and the last all of the United States not covered by the two other divisions. In the Southern and Western Classification territories the rules established by carriers allowed the lesser rate for a carload shipment only on a small percentage of the classified articles, and in both these territories restrictions were imposed prohibiting the intermingling of differently classified articles in one car for the purpose of

obtaining the carload rate, even though the articles, if they had been shipped separately in carload quantities, might have been entitled to the carload rate. The extent of these limitations upon the right to enjoy the lesser rate for the carload in the territories in question is shown by a statement made by the then chairman of the Interstate Commerce Commission, in the dissenting opinion delivered by him in *Export Shipping Co. v. Wabash R. R. Co.,* 14 I. C. C. Rep. 437, 443, viz.:

"A recent careful and authoritative examination of the several classifications shows that in the Southern Classification there are 3,503 less than carload and only 773 carload ratings, the carload ratings being 22.1 per cent of the less than carload; in the Western Classification there are 5,729 less than carload and only 1,690 carload ratings, the carload ratings being 29.8 per cent of the less than carload."

In the same opinion it is also stated that in both the Western and Southern Classification territory the small percentage accorded a carload rate was confined to goods embraced within lower grades of classification, taking therefor the lowest rates. In the Official Classification territory, however, a widely different allowance of carload ratings prevailed, since in that territory the carload rating was permitted on a very large number of articles. In that territory, as likewise remarked by Chairman Knapp, "there are 5,852 less than carload ratings and 4,235 carload ratings, the carload ratings being 72.4 per cent of the less than carload" against, as we have said, 25.8 per cent and 22.1 per cent in the other territories. This large difference was besides in effect made much greater not only by the higher grades of traffic to which the carload rate was extended, but also because of the enlarged right to ship in one car articles embraced in various classes of traffic to which the carload rating was extended.

There can be no doubt that the privilege of shipping at

a lesser rate for the carload shipment than was asked for a less than carload shipment came to be interwoven with and inseparable from the movement of commerce through the channels of railroad transportation.  And the benefits of the lesser rate came to be obtained not alone by an owner of all the goods shipped in a carload, but by combinations of owners, by agreements between them concerning particular and isolated shipments, by the organization of associations of shippers having for their object the creating of agencies to receive merchandise belonging to the members of the association and to aggregate and ship them in carload lots in the name of one consignor to a single consignee at one destination by the use of commission houses, storage and other companies, etc.  It is also undoubted that in consequence of the facility of shipping at a lesser rate for a carload than for a less than carload shipment there developed a class of persons known as forwarding agents, who embarked in the business of obtaining a carload rate for various owners of merchandise by aggregating their shipments, such agents relying for their compensation upon what they could make from the difference between the carload and less than carload rates. The business so carried on by these agents was thus described by Mr. Commissioner Knapp in his dissenting opinion, to which we have previously referred (14 I. C. C. Rep. 440):

"The business of the forwarding agent, in so far as is material to the question involved, is to collect less than carload shipments from different consignors, combine such shipments into carloads, and ship the same in the name of the forwarding agent, or of the owner of one of the less than carload shipments, to one consignee, who may be the forwarding agent himself, another forwarding agent at the point of destination with whom he has business relations, or the owner of a part of the property transported.  The consignee of the shipment, whoever he

may be, receives the carload and distributes its contents to the parties for whom they are intended. The forwarding agent finds his compensation and profit in the difference between the carload and less than carload rates.

"The saving effected by securing application of the carload, rather than the less than carload rates, may be divided between the forwarding agent and his customer in any agreed proportion. To the extent that the customer secures the carriage of his property at a lower rate than the less than carload rate, which would otherwise be applied, he saves money, and the division of the difference between the carload and the less than carload rates is a matter of private bargain between him and the agent."

The extent to which the right to avail of the carload rating in the various modes above stated had come to be a part of the business of the country is described in the opinion of the Commission in *California Commercial Association* v. *Wells, Fargo & Co.*, 14 I. C. C. Rep. 442, delivered on the same day that its opinion concerning this controversy was announced. The Commission said (p. 433):

"Few practices have become more firmly established in the transportation world than that of combining small quantities of freight of various owners and shipping at the relatively lower rates applicable to large consignments, and under this practice has developed an immense volume of traffic which otherwise could never have been brought into being. It is not an exaggeration to say that the enforcement of such a rule by the carriers of the United States would bring disaster upon thousands of the smaller industries and more surely establish the dominance of the greater industrial and commercial institutions."

And the alertness with which those engaged in commerce utilized every means afforded of shipping at lower cost is shown in the following statement made by Mr.

Commissioner Knapp in his opinion to which we have referred (14 I. C. C. Rep. 441):

"The individual shippers are not necessarily located at the same point, nor are the individual consignees. For instance, if a reduction in rates could be effected a furniture dealer at Grand Rapids, Mich., having a shipment for a point in Maine, and a furniture dealer in Rockport, Ill., having a shipment for a point in Massachusetts, might forward their separate shipments at less than carload rates to Chicago; there the two shipments would be consolidated and forwarded at carload rates to Boston; and thence shipped again at less than carload rates from Boston to their respective destinations."

It is obviously true that the extent to which the practice prevailed of combining shipments to avail of the benefit of the less than carload rate differed largely in the various territories, dependent upon the liberality of the tariffs on the subject. That is to say, in Official Classification territory, where the right to less than carload rates was extended to many items and the right to combine different articles in one shipment was more liberal than in the other territories, the business of combining diverse shipments into carload lots assumed much greater magnitude than in the other territories. However, about 1899, in Official Classification territory rules were adopted restricting the liberal right to obtain less than carload rates and the extended power to combine like or different articles in a carload, the restrictions probably having been brought about by the development of the business of forwarding agents. *The Buckeye Buggy Company* v. *C., C., C. & St. L. Ry. Co.,* 9 I. C. C. Rep. 620. The modifications in question which took the form of notes, to Rule 5–B and to Rule 15–E of the Official Classifications which regulated carload shipments, in effect forbade the combination of goods belonging to several owners for the purpose of a carload shipment and forbade therefore not only impliedly

but expressly the combination of goods for the purpose of carload rating by means of forwarding agents. The notes were as follows:

"Rule 5–B. In order to entitle a shipment to the carload rate, the quantity of freight requisite under the rules to secure such carload rate must be delivered at one receiving station, in one day, by one consignor, consigned to one consignee and destination, except that when freight is loaded in cars by consignor it will be subject to the car-service rules and charges of the forwarding railroad. (See note.)

\* \* \* \* \* \* \* \*

"Note. Rule 5–B will apply only when the consignor or consignee is the actual owner of the property.

"Rule 15–E. Shipments of property combined into packages by forwarding agents claiming to act as consignors will only be accepted when the names of individual consignors and final consignees, as well as the character and contents of each package, are declared to the forwarding railroad agent, and such property will be waybilled as separate shipments and freight charged accordingly. (See note.)

"Note. The term 'forwarding agents' referred to in this rule shall be construed to mean agents of actual consignors of the property, or any party interested in the combination of I. C. L. shipments of articles from several consignors at point of origin."

While the restrictions in question were adopted in 1899, from that time to about 1907, when the shipments which provoked this controversy were made, it would seem that there was no general effort to enforce the restrictions, although sporadic attempts to do so were undoubtedly made. The business, therefore, of aggregating the shipments of various owners, for the purpose of obtaining the benefit of the carload rate by all the means and devices which we have hitherto described, continued

substantially unchanged. The *Buckeye Buggy Company Case, supra.* See also statement in the dissenting opinion of Mr. Commissioner Knapp in the present case. 14 I. C. C. Rep. p. 442.

In the spring of 1907 the Export Shipping Company, a New Jersey corporation doing business in Chicago and in New York, shipped from Chicago to New York, by the several railroads who are appellees, three cars of freight, consisting of merchandise belonging to various owners which had been aggregated by the Export Company for the purpose of shipment, and thus becoming entitled to the carload rate. The shipments conformed in all respects to the regulations of the companies except to the extent that they came under the operation of the restrictions above referred to. On the arrival of each car in New York the carrier, instead of collecting the carload rate, exacted the less than carload rate, because of the restrictions in question. In August, 1907, the Export Company petitioned the Interstate Commerce Commission to award it reparation against the three carriers to the extent of the difference between the less than carload rates, which had been exacted and the sums which would have been paid if the carload rate had been demanded. The right to the relief was based upon the assertion that an unlawful discrimination had been occasioned. The railroad companies having answered, the three complaints were consolidated and heard at the same time. When the hearing had somewhat proceeded it was agreed that the petitions for reparation should be considered as having been amended so as to challenge the reasonableness of the restrictions referred to. After the case had been submitted to the Commission the Rockford Manufacturers' Shippers' Association of Rockford, Illinois, the Manufacturers' Association of Jamestown and the Judson Freight Forwarding Company were allowed to intervene, and the case was reopened and further testimony was re-

ceived in support of and against the contention that the assailed rules were in conflict with the second section of the act to regulate commerce.

The Commission, at the time the complaints were pending, had also before it the complaint of the California Commercial Association against Wells, Fargo & Co., involving an analogous question. On June 22, 1908, the report, opinion and order of the Commission in both cases were filed. 14 I. C. C. Rep. pp. 422, 437.

The general subject under consideration in this case was more elaborately discussed in the opinion in the California case and in the opinion in this case reference was made to the reasoning expounded in that case. The restrictions created by the rules to which we have referred were declared void and reparation was awarded. The carrier was commanded on or before a date named to desist from attempting to enforce the restrictions. Two members of the Commission dissented. Briefly stated, the Commission held, (a) that a carrier could not properly look beyond goods tendered to it for transportation "to the ownership of the shipment," as the basis for determining the application of its established rates, because doing so would be a violation of the second section of the act to regulate commerce; (b) that the fact that the carriers in Official Classification territory had voluntarily established both liberal carload rates and opportunities for combining various articles for the purpose of obtaining the carload rate, gave the carriers no right to discriminate by depriving one person or class of persons of the right thus granted; (c) that a forwarding agent was equally entitled with others to the benefit of a carload rate when published and established and that to deprive a forwarding agent of such rights would be a prohibited discrimination; (d) that in any view the restrictions formulated by the assailed rules were void because repugnant to the act to regulate commerce, since their enforcement as a matter of fact neces-

sarily created preferences and engendered discriminations which the act forbade; (*e*) that this, among other reasons was the case because the enforcement of the assailed restrictions would not only create preferences in favor of one set of persons against another but would create discriminations between places and would be revolutionary in its operation upon interstate traffic; (*f*) that irrespective of the abstract right of a carrier to make the ownership of goods offered for shipment a basis for applying its published rates, owing to the practical impossibility of a carrier being able to adequately enforce such a rule by determining who was the owner of the goods offered, such a rule as a matter of fact would in and of itself be an unlawful preference and discrimination forbidden by the act; and (*g*) that the same principle would control as to the attempt to establish a rule applicable alone to forwarding agents, because of the practical impossibility of distinguishing one class of agents from another. The reasons which led two members of the Commission to dissent were expounded in a careful opinion, stating views which were in substance the direct antithesis of those expressed by the Commission. For example, the dissenting opinion maintained first, that to deprive a carrier of the power to exclude a forwarding agent from the benefit of the carload rate would bring about discrimination against places and preferences in favor of persons prohibited by the act; second, that as the right to the carload rate was the offspring of the voluntary act of the carrier the right to restrict the privilege thus accorded to particular classes or conditions necessarily obtained; and, third, that in any event a forwarding agent who was but a dealer in railroad transportation, and therefore in a measure a competitor in business of a railroad carrier, was not within the prohibitions of the second section of the act to regulate commerce.

The railroad companies did not comply with the order

and before the date fixed for compliance commenced the present suit by filing their joint bill to enjoin the enforcement of the order and have it declared void. It suffices to say in substance that as a basis for the right to relief the bill challenged the propositions upon which the Commission had based its order and affirmatively propounded the grounds which led two members of the Commission to dissent from the conclusions of that body. It also suffices to say that the answer of the Commission traversed the affirmative grounds for relief asserted in the bill and averred the correctness of the order by it made upon the grounds stated in the opinion and report of that body. The order of the Commission and its report and opinion in this particular case, as also its opinion in the California Commercial Association case, which, as we have said, was decided on the same day, was made part of the answer, and the opinion in the Buckeye Buggy Company case was also attached.

A motion for a preliminary injunction was heard before the Circuit Court, composed of three judges, upon the pleadings, the affidavits of two officials of one of the complainant railroad companies and the evidence taken before the Commission. The motion was granted, and the enforcement of the order of the Commission was restrained until final hearing. The Circuit Court rendered no opinion other than the statement that a majority of the court were in accord with the reasoning and conclusions expressed in the dissenting opinion of the chairman of the Commission, and that they did not think it necessary to add anything to his exhaustive discussion of the questions presented. Thereafter the American Forwarding Company, Transcontinental Freight Company, and the Rockford Manufacturers' and Shippers' Association, were made parties defendant, and those concerns filed an answer, which adopted the averments contained in the answer of the Commission. Replications were duly filed. A decree

*pro confesso* was entered against the Export Shipping Company and its trustee in bankruptcy, the company having become bankrupt.

Adopting a suggestion made by the court in disposing of the motion for a preliminary injunction, it was stipulated between the solicitors for the various parties that the case should be treated as having been submitted for final hearing. Thereupon a final decree was entered, by which the order of the Commission was set aside and declared to be void. This appeal was then taken.

As shown by the opinion of the Commission and that of the two members who dissented, there were many and wide differences in the views expressed. On their face, however, when ultimately reduced, they will be found, in so far as they are here susceptible of review, to rest on but a single legal proposition, that is, the right of a common carrier to make the ownership of goods tendered to him for carriage the test of his duty to receive and carry, or what is equivalent thereto, the right of a carrier to make the ownership of goods the criterion by which his charge for carriage is to be measured. We say the contentions all reduce themselves to this, because in their final analysis all the other differences, in so far as they do not rest upon the legal proposition just stated, are based upon conclusions of fact as to which the judgment of the Commission is not susceptible of review by the courts. *Baltimore & Ohio R. R.* v. *Pitcairn*, 215 U. S. 481. This at once demonstrates the error committed by the lower court in basing its decree annulling the order of the Commission upon its approval and adoption of the reasons stated in the opinion of the dissenting members of the Commission. This follows, since the reasons given by the dissenting members, except in so far as they rested upon the legal proposition we have just stated, proceeded upon premises of fact, which, however cogent they may have been as a matter of original consideration, were not open to be so

considered by the court because they were foreclosed by
the opinion of the Commission.  Doubtless the mistake
of the court below in this respect was occasioned by over-
looking the scope of the Hepburn Act, and because the
decision below was made in June, 1909, before the an-
nouncement of the opinion in the *Pitcairn Case*.  The rea-
sons above stated also serve to narrow the contentions
pressed at bar, since such conditions likewise in their
essence but reiterate the conflict of opinion which de-
veloped in the Commission, but which for the reasons
stated are for the purpose of our review substantially
reducible to the one legal question which we have stated.
We shall therefore confine ourselves to a consideration of
that question and to such brief notice of the other con-
tentions urged as will make clear that they depend ulti-
mately upon conclusions of fact not open in this court for
review.

The contention that a carrier when goods are tendered
to him for transportation can make the mere ownership
of the goods the test of the duty to carry, or, what is
equivalent, may discriminate in fixing the charge for
carriage, not upon any difference inhering in the goods or
in the cost of the service rendered in transporting them,
but upon the mere circumstance that the shipper is or is
not the real owner of the goods is so in conflict with the
obvious and elementary duty resting upon a carrier, and
so destructive of the rights of shippers as to demonstrate
the unsoundness of the proposition by its mere statement.
We say this because it is impossible to conceive of any
rational theory by which such a right could be justified
consistently either with the duty of the carrier to trans-
port or of the right of a shipper to demand transportation.
This must be, since nothing in the duties of a common
carrier by the remotest implication can be held to imply
the power to sit in judgment on the title of the pros-
pective shipper who has tendered goods for transporta-

tion. In fact, the want of foundation for the assertion of such a power is so obvious that in the argument at bar its existence is not directly contended for as an original proposition, but is deduced by implication from the supposed effect of some of the provisions of the second section of the act to regulate commerce. In substance, the contention is that as the section forbids a carrier from "charging a greater or less compensation for any service rendered or to be rendered in the transportation of persons or property, . . . than it charges, demands, collects or receives from any other person or persons for doing for him or them a like and contemporaneous service in the transportation of a like kind of traffic under substantially similar circumstances and conditions," authority is to be implied for basing a charge for transportation upon ownership or non-ownership of the goods tendered for carriage, upon the theory that such ownership or non-ownership is a dissimilar circumstance and condition within the meaning of the section.

But this argument, in every conceivable aspect, amounts only to saying that a provision of the statute which was plainly intended to prevent inequality and discrimination has resulted in bringing about such conditions. Moreover, the unsoundness of the contention is demonstrated by authority. It is not open to question that the provisions of § 2 of the act to regulate commerce was substantially taken from § 90 of the English Railway Clauses Consolidation Act of 1845, known as the Equality Clause. *Texas & Pac. Railway* v. *Interstate Com. Com.*, 162 U. S. 197, 222. Certain also is it that at the time of the passage of the act to regulate commerce that clause in the English act had been construed as only embracing circumstances concerning the carriage of the goods and not the person of the sender, or, in other words, that the clause did not allow carriers by railroad to make a difference in rates because of differences in circumstances arising either be-

fore the service of the carrier began or after it was terminated. It was therefore settled in England that the clause forbade the charging of a higher rate for the carriage of goods for an intercepting or forwarding agent than for others. *Great Western R. Co.* v. *Sutton*, 1869—L. R. 4 H. L. 226; *Evershed* v. *London & N. W. Ry. Co.*, 1878—3 App. Cas. 1029, and *Denaby Main Colliery Co.* v. *Manchester &c. Ry. Co.*, 1885—11 App. Cas. 97. And it may not be doubted that the settled meaning which was affixed to the English Equality Clause at the time of the adoption of the act to regulate commerce applies in construing the second section of that act, certainly to the extent that its interpretation is involved in the matter before us. *Wight* v. *United States*, 167 U. S. 512; *Interstate Commerce Commission* v. *Alabama M. R. Co.*, 168 U. S. 144, 166.

As these considerations are decisive of the only legal question which, as we have already pointed out the case involves and also refute a subordinate contention that a forwarding agent is not a person within the meaning of that word as employed in the second section of the act to regulate commerce, we are brought, as we have hitherto said, to briefly refer to minor considerations pressed in argument, so far as they seem to us to be of sufficient weight to be entitled to particular notice.

First. It is urged that as the wide range of carload rates and the extent of the facility for combining articles for the purpose of obtaining such rates allowed in Official Classification territory are the result of the voluntary act of the railroads, therefore the power existed in the railroads to restrict and limit the enjoyment of such rate as was done by the assailed rules. In the interest of the public it is urged a limitation should not be now enforced which would compel the carrier to withdraw the facilities which shippers enjoy by the voluntary act of the carriers. But the proposition rests upon the fallacious assumption that because a carrier has the authority to fix rates it has

the right to discriminate as to those who shall be entitled to avail of them. Moreover, the contention is not open for review, because the legal question of the right of the carrier to consider ownership under the second section having been disposed of, the finding of the Commission that to permit the enforcement of the rule would give rise to preferences and engender discriminations prohibited by the act to regulate commerce embodies a conclusion of fact beyond our competency to reëxamine.

Second. Conceding, for the sake of the argument, the correctness of the construction which we have given to the second section, it is urged that nevertheless, as a forwarding agent is a "dealer in railroad transportation," and depends for his profit in carrying on his business upon the sum which can be made by him out of the difference between the carload and the less than carload rate, and may discriminate between the persons who employ him, therefore the act to regulate commerce should be construed as empowering a carrier to exclude the forwarding agent as a means of preventing such discriminations. But in the absence of any statutory authority to exclude the forwarding agent, and basing the right to exclude merely upon the assumption that the nature and character of his business would produce discrimination, and therefore justify the exclusion, the contention is not open for our consideration, because, like the previous one, it is foreclosed by the finding of fact of the Commission. Indeed, this is not merely the result of an implication from the finding of the Commission, since it was affirmatively found that to permit the carrier to exclude the forwarding agent would be to produce preference and discrimination. The contention then comes to this—that carriers should be permitted to give preferences and make discriminations as a means of preventing those unlawful conditions from arising.

Third. It is said that as the business of the forwarding

agent is in a sense competitive with that of a carrier and may largely diminish the revenue derived by railroad companies from their less than carload rates, and hence cripple their ability to successfully conduct business, therefore the right to exclude the forwarding agent, even if there is no power to exclude the owner or the ordinary agent of owners, should be permitted. This, however, again, in a twofold sense, is directly in conflict with the findings of fact made by the Commission; first, because it disregards the findings as to the operation of the business of a forwarding agent, and, second, because it overlooks the express finding of the Commission that it would be so difficult, if not impossible, for the carrier to determine in practice the nature and character of the title of a person tendering goods for shipment that the necessary result of a rule excluding a forwarding agent would be to embarrass shipments by owners or their special agents, and thus beget universal uncertainty and constant discrimination and preference against owners.

As it follows, from the reasons just stated, that the court below erred in annulling the order of the Commission and enjoining its enforcement, its decree to that effect is reversed and the case is remanded with directions to dismiss the bill.