# AMERICAN TRUCKING ASSOCIATIONS, INC., ET AL. *v.* ATCHISON, TOPEKA & SANTA FE RAILWAY CO. ET AL.

No. 57. Argued April 13 and 17, 1967.—Decided May 29, 1967.*

---

*Together with No. 59, *National Automobile Transporters Associa-. tion of Detroit* v. *Atchison, Topeka & Santa Fe Railway Co. et al.,* and No. 60, *United States et al.* v. *Atchison, Topeka & Santa Fe Railway Co. et al.,* also on appeal from the same court.

398

*Richard R. Sigmon* argued the cause for appellants in Nos. 57 and 59. With him on the brief were *Peter T. Beardsley, Harry J. Jordan, R. Edwin Brady, Albert B. Rosenbaum, Bryce Rea, Jr., James E. Wilson, Guy H. Postell, Ferdinand Born, LeGrand A. Carlston, F. H. Lynch, Jr., George S. Dixon, Roland Rice, Homer S. Carpenter* and *John S. Fessenden.* *Robert W. Ginnane* argued the cause for the United States et al. in No. 60. With him on the brief were *Solicitor General Marshall, Assistant Attorney General Turner, Richard A. Posner, Howard E. Shapiro* and *Fritz R. Kahn.*

*Thormund A. Miller* argued the cause for the Western and Southeastern Railroad appellees. With him on the brief were *Amos M. Mathews, J. D. Feeney, Robert F. Munsell* and *James W. Hoeland.* *Francis M. Shea* argued the cause for appellees Southern Railway Co. et al. With him on the brief were *William H. Dempsey, Jr., Walter J. Myskowski, W. Graham Claytor, Jr.,* and *James A. Bistline.* *Paul R. Duke* argued the cause for the Eastern Railroad appellees. With him on the brief were *Kemper A. Dobbins* and *Eugene E. Hunt.* *D. Robert Thomas* argued the cause for the Freight Forwarder appellees. With him on the brief was *Giles Morrow.*

MR. JUSTICE FORTAS delivered the opinion of the Court.

These three cases present the following question: Does the Interstate Commerce Commission have authority to promulgate rules providing (1) that railroads which offer trailer-on-flatcar (TOFC or "piggyback") service to the

public under open-tariff publications must make such service available on the same terms to motor and water common and contract carriers, and (2) that motor and water carriers may, subject to certain conditions, utilize TOFC facilities in the performance of their authorized service? *Ex parte 230, Substituted Service—Charges and Practices of For-Hire Carriers and Freight Forwarders (Piggyback Service)*, 322 I. C. C. 301 (1964).

A three-judge district court, convened under 28 U. S. C. §§ 1336, 2284, 2321–2325, at the request of various railroads and freight forwarders, set aside the rules which the ICC had promulgated in a rulemaking proceeding initiated on its own motion. 244 F. Supp. 955 (D. C. N. D. Ill. 1965). The case is here on direct appeal. 28 U. S. C. §§ 1253 and 2101 (b). 384 U. S. 902 (1966).

The appellees are the railroads and freight forwarders who initiated the District Court proceeding. The appellants are the United States and the ICC (No. 60), together with the American Trucking Associations, Inc., et al. (No. 57), and the National Automobile Transporters Association (No. 59), which intervened below as defendants.

More specifically, the issue presented is the validity of Rules 2 and 3, promulgated by the Commission in *Ex parte 230, supra.* 49 CFR §§ 500.2 and 500.3 (Supp. 1967). Rule 2 provides that "TOFC service, if offered by a rail carrier through its open-tariff publications, shall be made available" at the same charge to all other persons. In substance, it is a paraphrase of § 2 of the Interstate Commerce Act, 24 Stat. 379, as amended, 49 U. S. C. § 2 (hereinafter cited only to U. S. C.). Rule 3 provides that, with certain qualifications and subject to certain conditions, "motor common and contract carriers, water common and contract carriers, and freight forwarders may utilize TOFC service in the performance of all or any portion of their authorized service

through the use of open-tariff TOFC rates published by a rail carrier." The District Court held that the Commission has no authority to compel railroads to make open-tariff TOFC service available to such carriers, and that such carriers may not be authorized to use TOFC except if and as the railroad consents.

The background of the controversy may be briefly described. The growth of trailer-on-flatcar service has been "explosive" since the latter half of the 1950's.[1] From the time of passage in 1935 of Part II of the Act regulating motor carriers, until the institution of the present proceeding, the Commission appears to have regarded trailer-on-flatcar service not as bimodal, but as an adjunct of transportation by railroad—as a facility essentially of, by and for the railroads. This attitude is summed up by the ICC's definition of TOFC in 1954 in *Movement of Highway Trailers by Rail*, 293 I. C. C. 93 (the so-called *New Haven* case), which provided the basic legal framework upon which the development of TOFC traffic has been based. In that case, the Commission described TOFC or piggyback service as transportation of "a freight-laden trailer secured to a flatcar, which in turn is coupled in a train being drawn by a locomotive

[1] 322 I. C. C., at 305. The Commission observed, "There can be little doubt that piggybacking has been a decisive factor in returning to the railroads a substantial volume of traffic that previously had been moving by other modes of transportation, private and for-hire." *Id.*, at 307. It found that "In 1957 a total of 57 class I railroads were participating in TOFC tariffs; in mid-1963 there were 100 class I roads doing so. In 1955, 32 railroads reported a total of 168,150 TOFC carloadings, for a weekly average of 3,234. In 1959, 50 reporting railroads showed totals of 415,156 annual and 7,984 weekly average carloadings for TOFC. For 1963, 63 reporting railroads indicated continued growth to approximately 797,500 loaded TOFC cars, a weekly rate of approximately 12,700 [15,300] loadings." *Id.*, at 309.

over steel rails laid on the railroad's right-of-way . . . ."
*Id.,* at 100–101.[2]

Even prior to the *New Haven* case, beginning in 1939, in *Substituted Freight Service,* 232 I. C. C. 683, it was the Commission's position that a railroad could grant or deny TOFC service to common carriers by motor.[3] Even if the railroad offered such service generally to the public, it could withhold it from for-hire motor carriers. Except for limited uses of rail open tariffs permitted by certain railroads,[4] contract and common carriers by motor participated in piggyback service only by agreement, including through route-joint rate arrangements between a railroad and a trucker (see Plan V, *infra*), and railroad acceptance of trailers or containers of truckers, the shipment moving under motor carrier tariffs and the railroad's compensation being based upon a division of charges arrived at through negotiations between the carriers (Plan I, *infra*). These arrangements had to be voluntary for it has been the prevailing view that the railroads, as common carriers, had no duty to service truckers under their open tariffs, and, although § 216 (c), 49 U. S. C. § 316 (c), authorizes motor common carriers to establish through routes and joint rates with rail common carriers, the Commission had no power to compel such joint arrangements.

---

[2] For a statement of the Commission's earlier position, prior to enactment of Part II of the Interstate Commerce Act, see *Trucks on Flat Cars Between Chicago and Twin Cities,* 216 I. C. C. 435 (1936), where it was held that motor carriers, like any other competing mode of unregulated transportation (compare *ICC* v. *Delaware, L. & W. R. Co.,* 220 U. S. 235 (1911)), were entitled to utilize a published piggyback tariff.

[3] Section 1 (4) of the Act, 49 U. S. C. § 1 (4), imposes a duty on railroads to establish joint through routes and rates with water carriers, but there is no such provision with respect to motor carriers. See § 216 (c), 49 U. S. C. § 316 (c).

[4] Cf. *Gordon's Transports, Inc.* v. *Strickland Transp. Co.,* 318 I. C. C. 395, 396–397, sustained *sub nom. Strickland Transportation Co.* v. *United States,* 219 F. Supp. 618, 620 (D. C. N. D. Tex. 1963).

According to the Commission, five basic forms of piggyback service evolved (322 I. C. C., at 304–305, 309–312). They are:

Plan I (Joint Intermodal):

Railroad movement of trailers or containers of motor common carriers, with the shipment moving on one bill of lading and billing being done by the trucker. Traffic moves under rates in regular motor carrier tariffs, and the railroad's compensation is arrived at by negotiation between the two carriers.

Plan II (All-Rail):

Door-to-door service performed by the railroad, which moves its own trailers or containers on flatcars under open tariffs usually similar to those of truckers.

Plan III (All-Rail):

Ramp-to-ramp rates to private shippers and freight forwarders, based on a flat open-tariff charge, regardless of the contents of trailers or containers, which are usually owned or leased by freight forwarders or shippers. No pick-up or delivery is performed by the railroad.

Plan IV (All-Rail):

Flat open-tariff charge for loaded- or empty-car movement, the railroad furnishing only power and rails. Shipper or forwarder furnishes a trailer or container-loaded flatcar, either owned or leased.

Plan V (Joint Intermodal):

Joint railroad-truck or other combination of coordinated service rates. Either mode may solicit traffic for through movement, and traffic moves on originating carrier's bill of lading.

While data are not available precisely to define the growth of traffic under the various plans, the evidence indicates that major growth has been primarily in the

all-rail, open-tariff plans—that is, plans under which traffic moves at rail rates and on rail billings. The Commission's summary of responses to piggyback questionnaires, contained in the Record, shows that virtually all of the reporting railroads participate in Plans II and III and about three-fourths participate in Plan IV. However, only "somewhat more than half" of the reporting railroads participate in trucker-rail arrangements under either Plan I or V, and traffic in Plan V (joint railroad-truck rates-through routes) "generally is extremely limited." A number of the largest railroads do not offer to move trailers or containers for motor carriers on motor carrier bills of lading and billing under regular motor carrier tariffs (Plan I),[5] or offer it only for limited types of traffic such as automobiles, or only to their own subsidiaries. Over 80% of rail movement of motor carrier-rail piggyback is under Plan I. ICC Bur. of Econ., Piggyback Traffic Characteristics 21 (1966).

Faced with the explosive growth of piggyback service on the basis of principles which had evolved in the infancy of the development of piggyback, the Commission by notice dated June 29, 1962, commenced this proceeding which was its "first general investigation of what is probably the most significant recent development in transportation—trailer-on-flatcar or piggyback service." 322 I. C. C., at 303. Proposed rules were furnished to participants, opportunity was given to all of them to file statements, and an examiners' report was filed. After exceptions and oral argument, the Commission rendered

---

[5] There is "no Plan I service of any type available between midwest points east of the tier of states of Wyoming, Colorado, and New Mexico, on the one hand, and, on the other hand, points in the states west thereof. Transcontinental railroads operating between the latter points have elected not to offer any form of Plan I service to motor carriers between such points." Pacific Intermountain Express Co., Supplemental Statement of W. S. Pilling (R. 123).

its decision on March 16, 1964. The Commission stated that "It is our purpose and our hope to encourage the growth of this transportation phenomenon." 322 I. C. C., at 322. The rules which it prescribed incorporate the basic principles here at issue: that "when TOFC service is offered by a rail carrier to the public generally," it should likewise be available to motor or water common or contract carriers, in lieu of their authorized transportation between service points, or to for-hire carriers. *Id.*, at 336. These rules also include ancillary or implementing provisions which are not here at issue; for example, it is provided that the motor carrier must give notice in its tariff publication if TOFC is to be used, and the user of the water or motor carrier may specify "that in any particular instance TOFC service not be utilized" (49 CFR §§ 500.3 (b), (c), (d) (Supp. 1967)); and that these carriers may tender and receive traffic, TOFC, only at points that they are authorized to serve. *Id.*, § 500.3 (e).

The three-judge District Court concluded that Rules 2 and 3 (and Rule 5, *id.*, § 500.5, insofar as it amplified those Rules) exceeded the Commission's authority and set them aside. In substance it held that the Interstate Commerce Act did not forbid a railroad to refuse to carry the trailers or containers of a competing mode of carrier; that the structure and plan of the Act, as well as the specific absence of compulsory power to the Commission in § 216 (c), which authorizes voluntary joint rates and through routes by motor and rail carriers, indicated that the ICC is not at liberty to require the railroads to provide TOFC service to competing modes; that provisions of the Act regulating freight forwarders impelled the same conclusions; and that the Commission's long history of support for the position which its rules now repudiate, as well as legislative history, compelled rejection of the rules now promulgated. We disagree.

## I.

We first consider Rule 2, which raises the question whether the Commission may by rule require that if a railroad offers TOFC service to the public through its open-tariff publications, it must make that service available to "any person" without discrimination. We begin by noting the obvious fact that the Interstate Commerce Act codified the common-law obligations of railroads as common carriers. From the earliest days, common carriers have had a duty to carry all goods offered for transportation. See, e. g., *New Jersey Steam Nav. Co.* v. *Merchants' Bank,* 6 How. 344, 382–383 (1848). Refusal to carry the goods of some shippers was unlawful. Rates were required to be reasonable, but discrimination in the form of unequal rates as among shippers was not forbidden. In England, legislation to proscribe unequal rates, from which the antidiscrimination language of § 2 of the Interstate Commerce Act derives (*ICC* v. *Delaware, L. & W. R. Co.*, 220 U. S. 235, 253 (1911)), was enacted in 1845. The Railway Clauses Consolidation Act of 1845, 8 & 9 Vict., c. 20, § LXXXVI *et seq.* In this country, the railroads had a practical monopoly of freight transportation, and secret rebates, special rates to favored shippers, and discriminations flourished. It was this situation that led to enactment of the Interstate Commerce Act in 1887. 1 Sharfman, The Interstate Commerce Commission 17–19 (1931); *Louisville & N. R. Co.* v. *United States,* 282 U. S. 740, 749–750 (1931).

Section 1 (4) of the Act, 49 U. S. C. § 1 (4), provides that it shall be the duty of common carriers by rail to provide transportation "upon reasonable request therefor" and to establish just and reasonable rates. Section 2, 49 U. S. C. § 2, prohibits discriminatory rates or charges. Section 3 (1), 49 U. S. C. § 3 (1), forbids undue

preferences or advantages, and undue or unreasonable prejudices or disadvantages to any person, area or particular description of traffic. The Act does not contain any provision expressly exempting traffic offered by carriers by motor vehicle from these broad common-carrier obligations of the railroads. On the contrary, these sections of the Act, read in light of the historic obligations and duties of common carriers and the large number of decisions of the Commission, and of the courts in this country and in England, indicate, presumptively at least, that railroads may not offer the service of transporting trailers for other shippers and deny that service to motor carriers.[6] Indeed, as we have observed, the Commission's Rule 2 is practically a paraphrase of § 2 of the Act. It provides that if a rail carrier through its open-tariff publications offers TOFC services, it shall make the same available "to any person" at the same charge. It is, of course, of no consequence that the Act does not expressly command that the railroads furnish this service to motor carriers. Their obligation as common carriers is comprehensive and exceptions are not to be implied. The fact that the person tendering traffic is a competitor does not permit the railroad to discriminate against him or in his favor. See *ICC* v. *Delaware, L. & W. R. Co.*, 220 U. S. 235 (1911) (unlawful for railroads to charge less-than-carload rates for carload shipments tendered by freight forwarders); *ICC* v. *Baltimore & O. R. Co.*, 225 U. S. 326 (1912) (lower rates

---

[6] See, *e. g.*, *Great Western R. Co.* v. *Sutton*, L. R. 4 H. L. 226 (1869); *London & N. W. R. Co.* v. *Evershed*, 3 App. Cas. 1029 (1878); *Wight* v. *United States*, 167 U. S. 512 (1897); *ICC* v. *Baltimore & O. R. Co.*, 225 U. S. 326 (1912); *Louisville & N. R. Co.* v. *United States*, 282 U. S. 740 (1931); *Kansas City S. R. Co.* v. *United States*, 282 U. S. 760 (1931); *ICC* v. *Delaware, L. & W. R. Co.*, 220 U. S. 235 (1911); *United States* v. *Chicago Heights Trucking Co.*, 310 U. S. 344 (1940).

on coal shipped by another railroad for its own use as fuel held unlawful). Cf. *Wight* v. *United States*, 167 U. S. 512 (1897). As this Court said in *Delaware, L. & W. R. Co., supra:*

"The contention that a carrier when goods are tendered to him for transportation can make the mere ownership of the goods the test of the duty to carry, or, what is equivalent, may discriminate in fixing the charge for carriage, not upon any difference inhering in the goods or in the cost of the service rendered in transporting them, but upon the mere circumstance that the shipper is or is not the real owner of the goods is so in conflict with the obvious and elementary duty resting upon a carrier, and so destructive of the rights of shippers as to demonstrate the unsoundness of the proposition by its mere statement." 220 U. S., at 252.

This Court was faced with an intermodal problem, comparable to that in the present cases, in *United States* v. *Pennsylvania R. Co.*, 323 U. S. 612 (1945) (the *Seatrain* case). The railroads refused to interchange their freight cars with Seatrain, a water carrier, for interstate transportation by Seatrain in competition with the railroads. The ICC ordered the railroads to desist from this practice, and the railroads brought an action to set aside its order. The railroads contended that the Transportation Act of 1940, 54 Stat. 898, did not in "specific language" authorize the Commission to require them to furnish the disputed facility to a competing water carrier. But this Court rejected that contention. It said:

"There is no language in the present Act which specifically commands that railroads must interchange their cars with connecting water lines. We cannot agree with the contention that the absence

of specific language indicates a purpose of Congress not to require such an interchange. True, Congress has specified with precise language some obligations which railroads must assume. But all legislation dealing with this problem since the first Act in 1887, 24 Stat. 379, has contained broad language to indicate the scope of the law. The very complexities of the subject have necessarily caused Congress to cast its regulatory provisions in general terms. Congress has, in general, left the contents of these terms to be spelled out in particular cases by administrative and judicial action, and in the light of the Congressional purpose to foster an efficient and fair national transportation system. Cf. *Chicago, R. I. & P. R. Co.* v. *United States,* 274 U. S. 29, 36; *Interstate Commerce Commission* v. *Railway Labor Executives Assn.,* 315 U. S. 373, 376–377." 323 U. S., at 616.

In *Seatrain,* this Court emphatically rejected the analysis upon which the District Court here essentially based its position—that since the Act regulates rail, motor, and water carriers separately, in Titles I, II, and III, the Commission may not compel the mutual furnishing of services and facilities other than as expressly directed. Recognizing that in the case of water carriers (as distinguished from motor carriers), the Act specifically directs railroads to establish through routes with them, the Court held that this is not the end of the railroads' obligation or the limit of the Commission's power. On the contrary, the Court, relying on the National Transportation Policy (49 U. S. C. preceding § 1), held that the Act is designed "to provide a completely integrated interstate regulatory system over motor, railroad, and water carriers . . ." 323 U. S., at

618–619, and that the Commission therefore had powers commensurate with that goal. In this connection, the Court said:

"The 1940 Transportation Act is divided into three parts, the first relating to railroads, the second to motor vehicles, and the third to water carriers. That Act, as had each previous amendment of the original 1887 Act, expanded the scope of regulation in this field and correlatively broadened the Commission's powers. The interrelationship of the three parts of the Act was made manifest by its declaration of a 'national transportation policy of the Congress to provide for fair and impartial regulation of all modes of transportation subject to the provisions of this Act, so administered as to recognize and preserve the inherent advantages of each.' The declared objective was that of 'developing, coordinating, and preserving a national transportation system by water, highway, and rail, . . . adequate to meet the needs of the commerce of the United States . . . .' Congress further admonished that 'all of the provisions of this Act shall be administered and enforced with a view to carrying out the above declaration of policy.' 54 Stat. 899." 323 U. S., at 616–617.

In view of this, we cannot accept arguments based upon arguable inference from nonspecific statutory language, limiting the Commission's power to adopt rules which, essentially, reflect its judgment in light of current facts as to the proper interrelationship of several modes of transportation with respect to an important new development. For example, § 216 (c), 49 U. S. C. § 316 (c), authorizes the railroads to enter into voluntary arrangements for through routes and joint rates with motor carriers. There is no Commission power to compel the railroads to do so, and it is argued that from this we

should derive a congressional intent that the ICC may not compel the railroads to furnish services to the motor carriers in any circumstances. There is no basis for this vast leap from a particular authorization to a pervasive prohibition. See our discussion of *Seatrain, supra.*

It is also argued that a proviso to § 3 (1) of the Act, 49 U. S. C. § 3 (1), demonstrates that Congress did not intend to inhibit the railroads from discriminating against motor carriers. This contention, strenuously supported, is without merit. Section 3 (1) broadly prohibits any common carrier by rail from giving "any undue or unreasonable preference" to any person, locality or type of traffic. It then sets forth this proviso: *"Provided, however, That this paragraph shall not be construed to apply to discrimination, prejudice, or disadvantage to the traffic of any other carrier of whatever description."* This is language more notable for its awkwardness than for its clarity; but it certainly was not intended, as appellees urge, to grant license to discriminate against traffic *offered to the railroad* by another carrier. We have noted above that this Court has clearly held that such discrimination is not permissible. Moreover, there is an intelligible meaning which can be ascribed to the proviso and which is consistent with its history. The proviso means that the prohibition against "undue or unreasonable preference or advantage" is not to be construed to forbid practices, otherwise lawful, solely because they operate to the prejudice of another carrier. It was in these terms that the language of the proviso was explained by Senator Wheeler, the bill's sponsor. The proviso was taken almost verbatim from § 216 (d) of the Motor Carrier Act, 1935, 49 Stat. 558 (now 49 U. S. C. § 316 (d)). Explaining it, Senator Wheeler said:

> "Paragraph (d) . . . prohibits unjust discrimination or undue prejudice or disadvantage. The com-

mittee has added a provision that this prohibition shall not be construed to apply to the traffic of any other carrier of whatever description.

"In other words, some of the truck and bus operators were afraid that the railroads would come in and complain, and we added this provision so as doubly to protect the truck and bus operators.

"*This provision is added to meet the objection of certain interests that the original paragraph might have been construed so as to make it unlawful for a motor carrier to charge a rate which would place a rail carrier or any other carrier at a disadvantage. This contention is not well founded* in our judgment inasmuch as the provisions of this paragraph are substantially the same as those in section 3 (1) of the Interstate Commerce Act, which has been in effect since 1887, and have always been interpreted as covering unequal and unjust treatment by a carrier of its patrons. However, as I said, to make assurance double sure, this provision was added." 79 Cong. Rec. 5656 (1935). (Italics added.)

Accordingly, we are remitted to consideration of the provisions of the Act which, in the most general terms, require the railroads to perform as common carriers. It is not our duty, of course, to concern ourselves with a nice evaluation of the arguments as to whether the Commission pursued the course of wisdom in ordering the railroads to make piggyback service available to motor carriers if it is offered to others on open-tariff rates. It is our task to scrutinize the Commission's authority, not the substance of its exercise. We conclude that, in light of the mandate of the National Transportation Policy, the Commission had authority derived from the common-carrier obligations of the railroads as reflected in §§ 1 (4), 2, and 3 (1) of the Act to promulgate Rule 2 requiring

that any railroad offering TOFC service through its open-tariff publications must make that service available "to any person" on nondiscriminatory terms. We come, then, to Rule 3.

## II.

Rule 3, in general, authorizes "motor common and contract carriers, water common and contract carriers, and freight forwarders" to "utilize TOFC service in the performance of all or any portion of their authorized service through the use of open-tariff TOFC rates published by a rail carrier." At the outset, as discussed above, we reject the contention that the railroads, despite their common-carrier obligations and the absence of an exception thereto in the Act, may exclude carriers by competing modes of transportation from access to their publicly offered services and facilities; and we do not accept the argument that § 216 (c), 49 U. S. C. § 316 (c), which authorizes voluntary through route and joint rate arrangements between railroads and truckers, implies that the railroads have no other obligation to motor carriers and that no other obligation may be imposed upon them by the ICC in this respect. That contention is refuted by the *Seatrain* case, *supra.*

It is strenuously contended, however, that whatever may be the railroads' duty, common carriers by motor vehicle may not be authorized to substitute transportation by rail for the transportation by road which is the basis of their franchise—except with the agreement of the railroad. It is this exception that saps the argument of some of its force, if not its fervor. One would assume that if the motor carriers are not authorized by their franchise under the Act to substitute transportation by rail for transportation by road, they could not do so with the consent of the railroads. But neither the railroads, most of which, by agreement, provide

TOFC service to some motor carriers, nor the freight forwarders take this position. Nor did the court below. None of them urges the invalidity of Plan I as presently in use, which provides for trucker utilization of TOFC service with the railroad's concurrence.[7] As the District Court put it: "The policy explicit in Sections 216 (c) [authorizing voluntary rail-truck through routes, discussed above] and 402 (a)(5) [49 U. S. C. § 1002 (a)(5), defining freight forwarders, discussed below], and implicit in the structure of. the Interstate Commerce Act as a whole, does not allow a motor carrier to perform its authorized service simply by tendering the shipment to the railroad for transportation *without the railroad's concurrence.*" 244 F. Supp., at 967.[8] (Italics added.) As we have discussed, this "concurrence" of the railroads, where granted, permits truckers to use TOFC service not only pursuant to Plans I and V, *supra,* but also under Plan III and Plan IV, the latter being open-tariff arrangements. The argument of appellees and the reasoning of the District Court carefully concede that the motor carriers may, without violating the Act or their charters, utilize this substituted service.

But, regardless of this, there is no adequate reason to construe the Act so as to deprive the Commission of the power to authorize the carriers by motor vehicle to use TOFC when that service is offered by railroads to the public on open tariff. The Interstate Commerce

---

[7] A suit attacking the validity of Plan I service is pending. *Lone Star Package Car Co.* v. *United States,* Civ. No. 4–355 (D. C. N. D. Tex.).

[8] In important respects, motor carrier use of open-tariff TOFC differs from a motor-rail through route-joint rate TOFC arrangement. Hence the District Court's exception for open-tariff TOFC where the railroad consents cannot be justified as based upon the voluntary through route and joint rate provision of the Act. § 216 (c), 49 U. S. C. § 316 (c).

Act defines a "common carrier by motor vehicle" as "any person which holds itself out to the general public to engage in . . . transportation by motor vehicle." 49 U. S. C. § 303 (a)(14). This does not exclude joint arrangements with water carriers or rail carriers, which are expressly permitted by § 216 (c) on a voluntary basis, and according to the appellants and the District Court it is not inconsistent with the use of open-tariff TOFC if the railroad is willing. Clearly, too, a trucker which utilizes a ferry to transport its trailer and its cargo is not violating the statute or its certificate. We may properly assume, therefore, that the Act cannot be construed to require that the trucker must always transport its cargo exclusively by road. Appellees and the District Court argue, however, that the following factors demonstrate that the Commission may not authorize motor carriers to use TOFC service on open tariffs: the long history of the Commission's construction and application of the Act contrary to its present position, the history of congressional consideration, and the provisions of the Act relating to freight forwarders.

It is true, as we have stated, that the Commission for over 25 years has insisted that railroad concurrence is essential for trucker use of TOFC services. In *Substituted Freight Service*, 232 I. C. C. 683, the Commission held that a person may not be both a carrier and a shipper as to the same service. See also *Ringsby Truck Lines, Inc.* v. *Atchison, T. & S. F. R. Co.*, 263 I. C. C. 139, 141 (1945); and the *New Haven* case, 293 I. C. C. 93, 104–105 (1954). But see the earlier contrary holding in *Trucks on Flat Cars Between Chicago and Twin Cities*, 216 I. C. C. 435 (1936). The Commission's Report argues that *Substituted Freight Service*, correctly understood, does not proscribe the kind of substituted service here at issue, "in which one common carrier service is substituted for another through the use of an

open-tariff rate of the carrier performing the substituted service—provided that proper notice is given in the tariff publication of the carrier using the substituted service." 322 I. C. C., at 333. The Commission also argues that its subsequent decisions, cited above, are based upon an incorrect view of the *Substituted Freight Service* case. And it cites *Greer Broker Application*, 23 M. C. C. 417 (1940), and *Stone's Exp., Inc., Common Carrier Application*, 32 M. C. C. 525 (1942), as consistent with its present reading of *Substituted Freight Service.* We do not rest upon this analysis because, in any event, we agree that the Commission, faced with new developments or in light of reconsideration of the relevant facts and its mandate, may alter its past interpretation and overturn past administrative rulings and practice. Compare *SEC* v. *Chenery Corp.*, 332 U. S. 194 (1947); *FCC* v. *WOKO*, 329 U. S. 223 (1946). In fact, although we make no judgment as to the policy aspects of the Commission's action, this kind of flexibility and adaptability to changing needs and patterns of transportation is an essential part of the office of a regulatory agency. Regulatory agencies do not establish rules of conduct to last forever; they are supposed, within the limits of the law and of fair and prudent administration, to adapt their rules and practices to the Nation's needs in a volatile, changing economy. They are neither required nor supposed to regulate the present and the future within the inflexible limits of yesterday.

It is true that the attention of the Congress had been called to the need for action to secure the relief which the Commission subsequently granted in its rules. In February 1962, the American Trucking Associations, in the course of oral argument in *Gordon's Transports, Inc.* v. *Strickland Transp. Co.*, 318 I. C. C. 395, sustained *sub nom. Strickland Transportation Co.* v. *United States*, 219 F. Supp. 618 (D. C. N. D. Tex. 1963), apparently

urged that motor carriers be allowed to utilize TOFC open tariffs. On April 5, 1962, President Kennedy sent a transportation message to Congress calling for legislative action to "[a]ssure all carriers the right to ship vehicles or containers on the carriers of other branches of the transportation industry at the same rates available to noncarrier shippers . . ." so that the various carriers would be placed "in a position of equality with freight forwarders and other shippers in the use of the promising and fast-growing piggyback and related techniques." H. R. Doc. No. 384, 87th Cong., 2d Sess., p. 5 (1962). Secretary of Commerce Hodges transmitted to Congress proposed legislation to implement the President's message. Hearings on S. 3242 and S. 3243 before the Senate Committee on Commerce, 87th Cong., 2d Sess., pt. 1, p. 13 (1962). See also Hearings on S. 1061 and S. 1062 before Surface Transportation Subcommittee of the Senate Committee on Commerce, 88th Cong., 1st Sess., pt. 1, p. 3 (1963). Bills were introduced in 1962 and 1963. See S. 3242 and H. R. 11584, 87th Cong., 2d Sess. (1962); S. 1062 and H. R. 4701, 88th Cong., 1st Sess. (1963). On June 29, 1962, the Commission instituted the present proceeding. It advised Congress of its action and of its intention to "resolve" the matter or, if it could not, to recommend appropriate legislation. Surface Transportation Subcommittee Hearings, *supra,* pt. 2, p. 801; Hearings on H. R. 4700 and H. R. 4701 before the House Committee on Interstate and Foreign Commerce, 88th Cong., 1st Sess., pt. 1, p. 32 (1963). Following this, requests came from the industry to Congress that it withhold legislative action pending the Commission's decision. See, *e. g.,* Hearings on H. R. 4700 and H. R. 4701, *supra,* pt. 1, p. 213; pt. 2, p. 991. We do not regard this as legislative history demonstrating a congressional construction of the meaning of the statute, nor do we find in it evidence of

an administrative interpretation of the Act which should tilt the scales against the correctness of the Commission's conclusions as to its authority to prescribe the present rules. The advocacy of legislation by an administrative agency—and even the assertion of the need for it to accomplish a desired result—is an unsure and unreliable, and not a highly desirable, guide to statutory construction. The possibility of its use to prove more than it means may, but should not, deter administrative agencies from seeking helpful clarification of authority or a fresh and specific congressional mandate.[9]

The final argument to which we must address ourselves is vigorously made by the freight forwarder appellees. Freight forwarding is authorized and regulated in Part IV of the Interstate Commerce Act (49 U. S. C. § 1001 *et seq.*). This Part was enacted in 1942 (56 Stat. 284). A freight forwarder is defined as "any person which (otherwise than as a carrier . . . [by rail, motor vehicle or water]) holds itself out to the general public as a common carrier to transport or provide transportation of property, . . . and which . . . (A) assembles and consolidates . . . shipments . . . and (B) assumes responsibility for the transportation of such property . . . and (C) utilizes, for the whole or any part of the transportation of such shipments, the services of" a rail, motor vehicle or water carrier. § 402 (a)(5), 49 U. S. C. § 1002 (a)(5). It cannot perform the physical transportation except in its terminal areas. § 410 (h), 49 U. S. C. § 1010 (h). It assembles shipments, consolidates

---

[9] It should also be noted that the legislation proposed by the ICC itself (S. 3510 and H. R. 12362, 87th Cong., 2d Sess. (1962); S. 676 and H. R. 2088, 88th Cong., 1st Sess. (1963)) would have required railroads to establish motor-rail through routes and joint rates and granted the Commission power to compel such arrangements—which is quite different from entitling motor carriers to use railroad open tariffs.

them, ships them by common carrier (usually a railroad), receives them and separates and distributes them to individual consignees. The Act specifically provides that no permit to engage in freight forwarding shall be issued to any common carrier by rail, motor vehicle or water. § 410 (c), 49 U. S. C. § 1010 (c). But a freight forwarder may be controlled by such a carrier, or under common control with it, and the Act specifically provides that the Commission may not for this reason deny a permit to the freight forwarder. *Ibid.*

It is obvious that there is a good deal of overlap between the work of the freight forwarders and that of the other common carriers. The freight forwarders' argument here is that the Act authorizes only freight forwarders to engage in the assembly and consolidation of shipments and the subsequent use of rail facilities for transportation, and that permitting the truckers to engage in this sort of service, by means of TOFC on open tariffs, is to authorize them to engage in this service in violation of the Act's prohibition against licensing other carriers as freight forwarders.

Forwarders are presently permitted to utilize railroad open-tariff TOFC service. *Movement of Highway Trailers by Rail,* 293 I. C. C. 93, 111 (1954). They may even quote trailer-load rates in competition with truckers and with rails. *Eastern Express, Inc.* v. *United States,* 198 F. Supp. 256 (D. C. S. D. Ind.), aff'd, 369 U. S. 37 (1962). But railroads, within their terminal areas (§ 202 (c), 49 U. S. C. § 302 (c)), and truckers have also traditionally assembled, consolidated, and distributed cargo in connection with providing their authorized transportation services. The Act expressly exempts from the freight-forwarder provisions any person who performs these services—which are similar to those of freight forwarders—as a carrier subject to another part of the Act. § 402 (a)(5), 49 U. S. C. § 1002 (a)(5). The

House Report on Part IV makes it clear that the Part does not apply "with respect to transportation performed by . . . motor . . . carriers in accordance with the applicable provisions of the Interstate Commerce Act." H. R. Rep. No. 1172, 77th Cong., 1st Sess., p. 6 (1941).

The mere fact that the truckers, by reason of the Commission's Rules 2 and 3, may utilize open-tariff TOFC service, where offered generally, certainly does not convert their activity into freight forwarding, in conflict with the Act. It is clear that where the railroad agrees, the trucker may use this service, and that a motor vehicle common carrier may assemble, consolidate, transport by piggyback in these circumstances, and distribute after arrival at the railroad terminus. The fact that the Commission enlarges this additional possibility of transportation of the truckers' trailers may be a competitive fact of some significance, but it does not convert the truckers into freight forwarders, nor deprive the latter of the exclusive rights specified in the Act.

### III.

The controlling fact of the matter is that all piggyback service is, by its essential nature, bimodal.[10] It partakes of both the railroad and the trucking functions. The proper allocation of these bimodal functions involves complex considerations. It is not and cannot be precise or mathematical. Railroads are not now confined to the

---

[10] As the ICC observed: "What [those who object to open-tariff TOFC] overlook is that all TOFC service is inherently bimodal in that its basic characteristic is the combination of the inherent advantages of rail and motor transportation . . . ." 322 I. C. C., at 329. Thus, the District Court's view of the statutory compartmentalization of transportation as either rail or motor or water, fails to recognize the primary fact about TOFC, which in any of its varieties cannot be made to fit the District Court's rigid modal conceptualization.

rails. They operate trucks. They are permitted to assemble cargo and, if they so desire, to use their own trucks or subsidiary companies to do so. § 202 (c), 49 U. S. C. § 302 (c). Truckers are not now strictly confined to the highway. In the absence of congressional direction, there is no basis for denying to the ICC the power to allocate and regulate transportation that partakes of both elements; and there is no basis whatever for denying to the Commission the power to carry out its responsibilities under the National Transportation Policy, 54 Stat. 899 (1940), 49 U. S. C. preceding § 1, to "provide for fair and impartial regulation of all modes of transportation subject to the provisions of this Act, so administered as to recognize and preserve the inherent advantages of each . . . to the end of developing, coordinating, and preserving a national transportation system by water, highway, and rail, as well as other means, adequate to meet the needs of the commerce of the United States, of the Postal Service, and of the national defense." [11] This Court has observed that "The National Transportation Policy, formulated by Congress, specifies in its terms that it is to govern the Commission in the administration and enforcement of all provisions of the Act," and the Court has styled the National Transportation Policy as "the yardstick by which the correctness of the Commission's actions will be measured." *Schaffer Transp. Co.* v. *United States,* 355 U. S. 83, 87–88 (1957). Here the Commission has found that "the inherent advantages of each mode of transportation can be given freest play through the highest degree of coordination, and . . . encouragement of such coordination is

---

[11] Cf. *United States* v. *Rock Island Co.,* 340 U. S. 419, 433 (1951): "Complete rail domination [over motor transportation] was not envisaged as a way to preserve the inherent advantages of each form of transportation."

in the public-interest." 322 I. C. C., at 330. This conclusion, and its implementation in the TOFC rules, has obvious importance to "adequate, economical, and efficient service" and to the "establishment and maintenance of reasonable charges for transportation services," which are mandates of the National Transportation Policy. We cannot sustain the District Court's ruling that the Commission lacked power to promulgate the rules here in issue.

Accordingly, the decision below is *Reversed.*

MR. JUSTICE BLACK and MR. JUSTICE STEWART would affirm the judgment of the District Court for the reasons stated in the opinion of District Court Judge Hoffman reported at 244 F. Supp. 955, 961–964.

MR. JUSTICE HARLAN, finding it impossible to escape the impact of the proviso to § 3 (1) of the Interstate Commerce Act, 49 U. S. C. § 3 (1), would, for reasons elaborated in the portion of Judge Hoffman's opinion dealing with that point, 244 F. Supp. 955, at 961–964, affirm the judgment of the District Court.