In the Matter of BEST REFRIGER-
ATED EXPRESS, INC., Debtor.

Thomas HOARTY, Trustee, Plaintiff,

v.

C.H. ROBINSON COMPANY, Defendant.

Bankruptcy Nos. BK89–80169, A91–8010.

United States Bankruptcy Court,
D. Nebraska.

April 6, 1994.

Robinson owes the Trustee for unpaid freight bills or "undercharge" claims for freight being transported in interstate commerce pursuant to 49 U.S.C. §§ 10741(a), 10761 and 10762 (1993).

An undercharge claim represents a claim for the difference between the shipping rate Best had on file with the Interstate Commerce Commission (ICC) under its motor common carrier permit and the negotiated rate Best actually charged Robinson, which was paid in full at the time of the billing. In this case, the difference between these amounts, which is the amount sought by the Trustee, is $255,804.84.

This proceeding involves 845 shipments made by Best on behalf of Robinson. The shipments were made between January 9, 1986, and January 11, 1990. Robinson argues that these shipments moved subject to the Master Contract Carrier Agreement entered into with Best on February 13, 1985 (1985 Agreement). Best originally billed Robinson pursuant to the rates negotiated in the 1985 Agreement and under its motor contract permit. Negotiated rates entered into under the authority of a motor contract permit are not filed with the ICC because the ICC has exempted motor contract carriers from filing rates. *Exemption of Motor Contract Carriers from Tariff Filing Requirements*, 133 M.C.C. 150 (1983), *aff'd sub nom Central & Southern Motor Freight Tariff Ass'n v. United States*, 757 F.2d 301 (D.C.Cir.1985), *cert. denied*, 474 U.S. 1019, 106 S.Ct. 568, 88 L.Ed.2d 553 (1985). The Trustee argues that a valid motor contract did not exist and that Robinson owes the Trustee the difference between the contract rate and the higher rate on file with the ICC under its common carrier authority.

On October 8, 1991, this Court issued a Journal Entry which stayed the adversary proceeding and referred the undercharge issue to the ICC. Filing no. 12. Robinson petitioned the ICC to determine that it was not liable for the undercharge claims on the following grounds: (1) The parties negotiated rates pursuant to Best's motor contract carrier authority and the 1985 Agreement; therefore, the common carrier rates do not apply

---

John Siegler, Sims, Walker & Steinfeld, P.C., Washington, DC, for Trustee/plaintiff.

Peter A. Greene, Thompson, Hine & Flory, Washington, DC, and Gerald Friedrichsen, Fitzgerald, Schorr, Barmettler & Brennan, Omaha, NE, for defendant.

### MEMORANDUM

TIMOTHY J. MAHONEY, Chief Judge.

Hearing was held on December 8, 1993, on a Motion for Summary Judgment filed by defendant. Appearing on behalf of trustee/plaintiff was John Siegler of Sims, Walker & Steinfeld, P.C., Washington, D.C. Appearing on behalf of defendant was Peter A. Greene, Thompson, Hine and Flory, Washington D.C. Also appearing on behalf of defendant was Gerald L. Friedrichsen, Fitzgerald, Schorr, Barmettler & Brennan, Omaha, NE. This memorandum contains findings of fact and conclusions of law required by Fed.Bankr.R. 7052 and Fed.R.Civ.P. 52. This is a core proceeding as defined by 28 U.S.C. § 157(b)(2)(E) and (O).

### Background

Best Refrigerated Express, Inc. (Best), filed a petition under Chapter 11 of the Bankruptcy Code on February 7, 1989. Best, a trucking firm, operated in interstate commerce as a motor contract carrier and a motor common carrier. C.H. Robinson Company (Robinson) is a licensed broker of property. The adversary proceeding alleges that

to Robinson; (2) If the common carrier rates are applicable, the rates are unreasonable under the Interstate Commerce Act and ICC regulations, and therefore, are inapplicable; (3) The majority of the types of goods that were shipped under the agreement are goods that are exempt from ICC regulation.

The ICC ruled that Robinson and Best had entered into the 1985 Agreement under Best's contract motor carrier authority; therefore, the rates that were billed pursuant to the 1985 Agreement were the applicable rates, and the Trustee was not entitled to an undercharge claim. The ICC concluded that its finding that Best acted pursuant to motor contract authority was dispositive of the entire case and, therefore, did not determine whether the filed rates were unreasonable or whether the goods shipped by Best were exempt from ICC regulation. *See C.H. Robinson Company—Petition For Declaratory Order—Certain Rates and Practices of Best Refrigerated Express, Inc.,* No. 40753 (I.C.C. Sept. 16, 1993) [hereinafter *C.H. Robinson* ].

After the ICC decided *C.H. Robinson,* the parties returned to this Court where Robinson moved for summary judgment on October 7, 1993. Filing no. 15. The Trustee resisted on the ground that the ICC erred by holding that the agreement between Robinson and Best was a motor contract agreement and not a common carrier agreement. Filing no. 17. Hearing was held on December 8, 1993. At the hearing, the Court ordered both parties to submit comments about the applicability of the new statute, the Negotiated Rates Act of 1993. The parties have submitted their materials and the matter is ready for decision on the summary judgment motion.

### Discussion and Decision

■ Motions for summary judgment are filed pursuant to Fed.Bankr.R. 7056, which incorporates Fed.R.Civ.P. 56. A summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.Bankr.R. 7056(c); Fed.

R.Civ.P. 56(c); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The summary judgment procedure is appropriate in an action to review the record of an administrative agency because the reviewing court is generally limited to determining matters of law, i.e. sufficiency of record, statutory authority of agency, etc., and if there is no material issue of fact and only a question of law, summary judgment is appropriate. 6–Pt. 2 Moore's Federal Practice ¶ 56.17[3], 56–362—56–364 (2d ed. 1993) (citing *Milton v. Harris,* 616 F.2d 968 (7th Cir.1980) (holding that summary judgment is appropriate when no issue of material fact exists, and the court is reviewing administrative record for sufficiency of evidence)).

### A. The Negotiated Rates Act of 1993

On December 3, 1993, the President signed the Negotiated Rates Act of 1993 into law. Negotiated Rates Act of 1993, Pub.L. No. 103–180, §§ 1–9, 107 Stat. 2044 (codified as amended at 49 U.S.C. § 10701) (1993) [hereinafter the Act]. The Act amended Title 49 of the U.S. Code by promulgating retroactive standards to determine whether or not a motor carrier or its representative is entitled to undercharge claims. The Trustee argues that the Act exempted carriers who were in bankruptcy and that the Act violated § 541(c) of the Bankruptcy Code. Robinson's position is that the Act is not relevant because the ICC's decision in *C.H. Robinson* was filed before the Act was passed.

It is the opinion of this Court that the passage of the Act does not affect the ICC's decision in or this Court's review of *C.H. Robinson.* Because the ICC decision was filed in September, 1993, almost three months before the Act was passed, this Court will review *C.H. Robinson* pursuant to the legal standards applicable before the Act was passed. The ICC decision is based on an interpretation of regulations in effect when the shipments were made. Although those regulations were repealed, the Act reinstates the law in effect at the time these undercharge claims arose and is not in conflict with the legal standards followed by the ICC in *C.H. Robinson.*

Motor contract carrier standards exist in Section 6 of the Act. § 6, codified as amended at 49 U.S.C. § 10702. The Act reinstates prior ICC regulations which were located at 49 C.F.R. § 1053.1 and were repealed in 1992. Since the ICC regulations that were repealed were in effect at the time the undercharge claims arose and followed by the ICC in *C.H. Robinson,* the Act's amendment does not affect this Court's review.

### B. Standard of Review

When a court reviews an agency's action, the court must give the agency action a "presumption of regularity." *Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402, 415, 91 S.Ct. 814, 823, 28 L.Ed.2d 136 (1971). A court may overturn the ICC's decision "only if it f[inds] that decision to be 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law.'" *First Nat'l Bank v. Smith,* 508 F.2d 1371, 1373 (8th Cir.1974) (quoting 5 U.S.C. § 706(2)(A) (1988)), *cert. denied,* 421 U.S. 930, 95 S.Ct. 1655, 44 L.Ed.2d 86 (1975). Under the arbitrary and capricious standard, a court must defer to the ICC's decision if the decision has a rational basis. *Missouri Dep't of Social Servs. v. United States Dep't of Educ.,* 953 F.2d 372, 375 (8th Cir.1992).

It is well established that "[r]egulatory agencies do not establish rules of conduct to last forever; they are supposed, within the limits of the law and of fair and prudent administration, to adapt their rules and practices to the Nation's needs in a volatile changing economy." *American Trucking Ass'n, Inc. v. Atchison, T. & S.F.R. Co.,* 387 U.S. 397, 416, 87 S.Ct. 1608, 1618, 18 L.Ed.2d 847, *reh'g denied,* 389 U.S. 889, 88 S.Ct. 11, 19 L.Ed.2d 197 (1967). It is expected that agencies such as the ICC require ample latitude to "adapt their rules and policies to the demands of changing circumstances." *Motor Vehicle Mfrs. Ass'n of the United States, Inc. v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 42, 103 S.Ct. 2856, 2866, 77 L.Ed.2d 443 (1983) (quoting *Permian Basin Area Rate Cases,* 390 U.S. 747, 784, 88 S.Ct. 1344, 1369, 20 L.Ed.2d 312, *reh'g denied, Bass v. Fed. Power Com.,* 392 U.S. 917, 88 S.Ct. 2050, 20 L.Ed.2d 1379 (1968)). This latitude gives the ICC the authority to change how it defines and interprets its regulations in order to be responsive to the realities of the market place.

A court reviewing an agency's decision may not balance policy considerations, or choose among competing interests when evaluating the reasonableness of an agency's action. *Arkansas AFL–CIO v. F.C.C.,* 11 F.3d 1430, 1441 n. 10 and accompanying text (8th Cir.1993) stating that the reviewing court should not examine whether the agency's interpretation is the best interpretation of the statute, but should determine that the agency's interpretation does not conflict with the statute. Because of the degree of deference granted to a regulatory agency, a court should look narrowly at the decision of the ICC and will not substitute its own judgment for that of the agency. *Motor Vehicle Mfrs. Ass'n,* 463 U.S. at 43, 103 S.Ct. at 2866.

### C. Statutory Authority & Discussion

The Interstate Commerce Act defines "motor contract carrier" as:

> "a person providing motor vehicle transportation of property for compensation under continuing agreements with one or more persons—designed to meet the distinct needs of each such person."

49 U.S.C. § 10102(15)(B)(ii) (1993). The regulation that identified the elements of "continuous agreements" was 49 C.F.R. § 1053.1, which stated:

> No contract carrier by motor vehicle, as defined in 49 U.S.C. § 10102(15), shall transport property for hire in interstate commerce except under special and individual contracts or agreements which shall be in writing, shall provide for transportation for a particular shipper or shippers, shall be bilateral and impose specific obligations upon both carrier and shipper or shippers, shall cover a series of shipments during a stated period of time in contrast to contracts of carriage governing individual shipments, and copies of which contracts or agreements shall be preserved by the carriers parties thereto so long as such contracts or agreements are in force and for at least one year thereafter.

974

49 C.F.R. § 1053.1 was in effect at the time the parties entered into the written agreement; however, since that time, the ICC has eliminated the regulation because it has "outlived [its] usefulness and [caused] more harm than good." Ex Parte No. MC–198, 1991 MCC LEXIS 16 (I.C.C. February 20, 1991). But, the ICC followed Regulation 1053.1 in *C.H. Robinson* since the shipments occurred while the regulation was in effect and because the repeal of a regulation may not be applied retroactively unless the retroactive application is authorized by a statute. *Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 208, 109 S.Ct. 468, 471, 102 L.Ed.2d 493 (1988).

The term "distinct needs" as used in 49 U.S.C. § 10102(15)(B)(ii) (1993) is defined as a need for more specialized services than a common carrier can provide. *Don Barclay, Inc. v. Stewart & Stevenson Servs., Inc.*, 761 F.Supp. 194, 200 (D.Mass.1991) (citing *Global Van Lines, Inc. v. I.C.C.*, 804 F.2d 1293, 1301 (D.C.Cir.1986); *Global Transp. Servs., Inc. v. United Shipping Co. (In re United Shipping Co.)*, 134 B.R. 359 (Bankr. D.Minn.1991); *Transrisk Corporation, Inc. v. Matsushita Electric Corp.*, 15 F.3d 313 (4th Cir.1994) (" "Distinct needs", as interpreted by the federal courts, "is a need for a different or a more select or a more specialized service than common carriage provides." *Global Van Lines, Inc. v. Interstate Commerce Commission*, 256 U.S.App.D.C. 264, 804 F.2d 1293, 1301 (D.C.Cir.1986)"). In a situation such as Best's in which the carrier has both a contract and common carrier permit, the test for whether the carrier meets a "distinctive need" is whether the carrier operates on a committed basis and over a continuing period of time. *Barclay*, 761 F.Supp. at 200 (quoting *Interstate Van Lines, Inc., Extension—Household Goods*, 5 I.C.C.2d 168 (December 6, 1988)); *Global Transportation*, 134 B.R. at 366.

The Trustee argues that the ICC has recently broadened its definition of motor contract carrier beyond the bounds set by the ICC's original interpretation of Regulation 1053.1 and of the ICC's original interpretation of "distinct needs", and that the expansion of the definition is impermissible. The Trustee cites three older negotiated rate cases where the ICC defined the distinction between motor contract and motor common carriers by requiring motor contract carriers to strictly comply with ICC regulations before finding that the requirements for establishing motor contract agreement were met. *See Conagra Poultry Company—Petition For Declaratory Order*, 1988 Fed.Carr.Cas. (CCH) ¶ 37,524 (1988); *MCI Telecommunications Corp. v. E.L. Murphy Trucking Co.*, 1989 Fed.Carr.Cas. (CCH) ¶ 37,748 (1989); *Diversey Wyandotte Corp.—Petition For Declaratory Order*, 1990 Fed.Carr.Cas. (CCH) ¶ 37,831 (ICC June 4, 1990).

The ICC has since changed its policy from requiring absolute compliance with its regulations to requiring substantial compliance with the requirements of Regulation 1053.1, and noted "it is not our policy to find a lack of contract carriage based on simply, technical oversights or omissions." *General Mills, Inc.—Petition for Declaratory Order—Certain Rates and Practices of United Shipping Co., Inc.*, 8 I.C.C.2d 313 (1992) [hereinafter *General Mills* ]. The ICC now examines the "totality of the circumstances" to determine whether the shipment was moved under a common carrier agreement or a contract agreement. *Id.* at 323; *Contracts For Transportation of Property*, 8 I.C.C.2d 520, 529 (1992) [hereinafter *Contracts* ]; *Ford Motor Co. v. Security Services f/k/a Riss Intl.*, 9 I.C.C.2d 892, 896–97 (1993) [hereinafter *Ford v. Riss* ]. Under the totality of the circumstances test, the ICC distinguishes contract carriers from common carriers by focusing on the following factors:

It is the ongoing relationship, service commitment, and commercial link between a carrier and its shippers that render contract carriage inherently different from common carriage service alternatives. For example, the Commission may look at the circumstances surrounding the particular transportation service to determine whether the shipments at issue moved under a continuing agreement, and whether the transportation involved the use of dedicated equipment or a service tailored to meet the distinct needs of the shipper.

*C.H. Robinson,* at 6 (citing *General Mills,* 8 I.C.C.2d at 323; *Contracts,* 8 I.C.C.2d at 529; and *Ford v. Riss,* 9 I.C.C.2d at 896–97).

The ICC has the authority to issue new policy statements that establish new formulas to determine how the parties will be regulated under the Interstate Commerce Act. *Ryder Truck Lines, Inc. v. U.S.,* 716 F.2d 1369 (11th Cir.1983), *cert. denied,* 466 U.S. 927, 104 S.Ct. 1707, 1708, 80 L.Ed. 181 (1984) (holding that the ICC's new policy which adopted a new formula to distinguish "for hire" carriers from "private" carriers was rational under the Act). The rule in this Circuit is that an administrative agency has the discretion to alter its interpretation of a statute in light of changed circumstances. *Arkansas AFL–CIO,* 11 F.3d at 1441. However, in a situation such as this one where the ICC has altered its interpretation of its regulations to the point where the new interpretation is in conflict with its prior interpretation, the reviewing court should adhere to the following principle stated by the Eighth Circuit:

> We note that an agency interpretation of a statutory provision which conflicts with the agency's earlier interpretation is entitled to considerably less deference than a consistently held agency view. *Watt v. Alaska,* 451 U.S. 259, 273 [101 S.Ct. 1673, 1681, 68 L.Ed.2d 80] (1981). However, we keep in mind the caution that:
>
> > [r]egulatory agencies do not establish rules of conduct to last forever; they are supposed, within the limits of the law and of fair and prudent administration, to adapt their rules and practices to the Nation's needs in a volatile, changing economy.
>
> *American Trucking Ass'n, Inc. v. Atchison Topeka & Santa Fe Ry. Co.,* 387 U.S. 397, 416 [87 S.Ct. 1608, 1618, 18 L.Ed.2d 847] (1967) [sic].

*Arkansas AFL–CIO,* 11 F.3d at 1441 n. 11. Therefore, if the ICC's decision in *C.H. Robinson* is reasonable under the Interstate Commerce Act and is reasonable under the ICC's own regulations, this Court will defer to the "totality of the circumstances" test adhered to by the ICC.

### D. Review of the ICC Decision

Upon review of the ICC's decision in *C.H. Robinson,* this Court finds that the decision is not arbitrary or capricious and has a rational basis in law. The Trustee argues that the shift in the ICC's definition of contract carriers is a "complete evisceration" of the statute governing contract carriage at the ICC. Filing no. 17, at 24. The Trustee believes that the shift from strict compliance to a focus on the intent of the parties is somehow invalid; however, the Trustee submits no evidence or case law that states that it is impermissible for an administrative agency to alter its interpretation of its various rules and regulations. As discussed above, Congress granted the ICC the authority to revise its interpretation of regulations to reflect the reality of the marketplace. *Arkansas AFL–CIO,* 11 F.3d at 1441.

The ICC's decision in *C.H. Robinson* found that the agreement entered into between Best and Robinson was an agreement under Best's motor contract authority. *Id.* at 8. The ICC began its analysis by studying the letters exchanged between Best and Robinson prior to entering into 1985 Agreement. The ICC found that Robinson, in its capacity as a broker, sent Best a letter and an application packet to be used by Best to secure a motor contract carrier permit. *Id.* at 2. ICC noted that when Best submitted its application for a motor contract permit to the ICC for approval, the application included a statement of support from Robinson which explained why Robinson required Best's services under a motor contract permit, what distinct needs Robinson required Best to meet under its contract authority, and why a motor common carrier permit would not address Robinson's needs. *Id.* at 2 n. 5. The Trustee does not refute this evidence, but merely argues that this "intent" is not sufficient to constitute a motor contract carriage service agreement.

Based upon Best's application and the support of Robinson, the ICC granted Best a motor contract permit to provide continuing contract carriage to brokers like Robinson. *C.H. Robinson* at 2–3. An official for Robinson stated that its agreement with Best was part of an overall business plan to establish a

network of contract carriers with whom they would have continuing service and reliable service in accordance with customer needs. *Id.* at 3. Such a business plan was formulated after the ICC determined in *Dixie Midwest Exp., Inc., Ext.—Gen. Commod.,* 132 M.C.C. 794, 814 (1982), that a licensed transportation broker would be considered a shipper for the purposes of contracting with motor contract carriers. *C.H. Robinson* at 3.

The ICC determined that Best and Robinson entered into the 1985 Agreement on February 13, 1985, just days after the permit was issued, and the parties intended that every shipment would move under the 1985 Agreement. *C.H. Robinson* at 3. The ICC determined that once Best was issued its contract carrier permit to provide services to brokers, Robinson was entitled to rely on Best to transport under that permit as long as the permit was in effect. The ICC further found that both parties did, at all times during the course of the transportation agreement, intend that Best was operating under its motor contract permit, that Best billed Robinson under its motor contract authority, and that Robinson paid Best pursuant to the rates established by the motor contract agreement. *Id.* at 6–7. The Trustee argued that all of this evidence is irrelevant because the intentions of the parties do not matter if the technical standards for motor contract carriage are not met. *Id.*

■ This Court finds that the ICC acted reasonably when it determined that the parties intended to enter into motor contract carriage, and the ICC's decision regarding the intent of the parties is entitled to deference from this Court. In examining the totality of the circumstances in this case, the ICC did not only address the intent of the parties, but also addressed technical compliance with the statute and regulations relating to motor contract carriage.

Under 49 C.F.R. § 1053.1, which was in effect during the time the shipments were made, the 1985 Agreement must meet the following to satisfy the "continuing agreements" requirement: the agreement must be in writing; it shall be a bilateral agreement and impose specific obligations on each party; it shall provide shipping for a particular

shipper; it shall cover a series of shipments during a stated period of time; and the agreement shall be preserved by the parties for at least one year thereafter.

The ICC found that all of these requirements were met. *See generally C.H. Robinson* at 7. First, the ICC found that the 1985 Agreement was in writing. The ICC also found that the agreement was bilateral because specific obligations were imposed on both parties. The ICC determined that Best constituted the specific shipper and that Robinson was the specific broker. The ICC also believed the testimony of an official for Robinson who stated that the 1985 Agreement was intended to cover a series of shipments over an extended period of time. *Id.* at 3. The volume of the shipments, 845, and the period of time that the agreement was in effect, four years, are dispositive factors that the 1985 Agreement covered more than individual shipments, which is indicative of common carriage, and represented an extended and continuing series of shipments. *Transrisk Corp.,* 15 F.3d at 316–17; *see also Barclay,* 761 F.Supp. at 202 ("continuing" refers to regularly reoccurring needs and repeated transactions, not isolated transactions.). It is apparent that the parties have preserved the 1985 Agreement because the ICC was able to review the 1985 Agreement.

This Court will defer to the finding of the ICC that the 1985 Agreement was a continuing agreement. The Trustee has argued that the ICC has repeatedly foregone requiring compliance with its own regulations and statutes in favor of its totality of the circumstances test. This Court finds that the Trustee's argument is misplaced because the 1985 Agreement and the shipments carried out under it appear to technically as well as subjectively satisfy Regulation 1053.1. The Trustee's main complaint is that the standards under which these requirements are evaluated have been altered. However, this Court finds it acceptable for the ICC to alter its own interpretations of its regulations and the statutes that Congress has designated the ICC to administer. The manner in which the ICC has chosen to interpret Regulation 1053.1 is consistent with the language of the

regulation, and this Court defers to the ICC's reasonable and sufficient conclusion.

 The ICC concluded that the 1985 Agreement satisfied the requirement that the contract carriage arrangement meet a distinct need. The ICC based its conclusion on several factors. First, the ICC noted that Best was granted a contract carrier permit in part upon the statement by Robinson in Best's application that because of the distinct needs that needed to be attended to in the arrangement, Best should be granted a contract carrier permit. *C.H. Robinson* at 2 n. 5. Specifically, Robinson cited its need for price flexibility from Best. *Id.* In addition, an official from Robinson testified that the 1985 Agreement enabled Robinson to "arrange service for its customers in accordance with its service commitments." *Id.* at 3. Best was also required to carry cargo liability insurance, which was not required for contract carriers, at a level greater than the dollar amount of coverage that a common carrier was required to carry under 49 U.S.C. § 10927(a)(3). *Id.* at 3, 7 n. 12 and accompanying text. Finally, the official testified that Robinson needed to be able to respond to traffic opportunities by confirming price quotations within 24 hours, which permitted Robinson to control its pricing. *Id.* ICC concluded price flexibility was a distinct need. *Id.* at 7.

This Court will defer to the ICC's conclusion that the contract carrier relationship satisfied a distinct need. It is clear from *C.H. Robinson* that Robinson had distinct needs that it believed could be satisfied only by entering into a contract carrier agreement, not a common carrier relationship. The Trustee did not submit any argument or evidence to the ICC that Best did not satisfy the needs enumerated by Robinson, or that Robinson's needs were non-existent. The ICC's interpretation of "distinct needs" is reasonable under 49 U.S.C. § 10102(15)(B)(ii).

When carrying out its decision-making authority, it is not only recognized that the ICC will resolve disputes, but also, the ICC is entrusted to protect public policy. *Chesapeake and Ohio Ry. Co. v. United States,* 704 F.2d 373, 375–76 (7th Cir.1983) (noting that preserving a competitive interest is implicit in Interstate Commerce Act); *see generally* 49 U.S.C. § 10101 (1993) (listing the transportation policies that the ICC must protect). The ICC's integration of traditional contract law by looking at the conduct and intentions of the parties with its previous rules under 49 U.S.C. § 10102(15)(B) to define motor contract carriers is rationally related to the promotion of the transportation policies enumerated in Section 10101, such as "encouraging sound economic conditions among carriers," 49 U.S.C. § 10101(a)(1)(C); "promoting competitive and efficient transportation services in order to allow a variety of quality and price options to meet changing market demands and the diverse requirements of the shipping and traveling public." 49 U.S.C. § 10101(a)(2)(B).

Robinson has the right to rely on Best to conduct itself lawfully under the motor contract permit requirements since Best was issued its contract permit for the purpose to serve Robinson as a contract carrier. *C.H. Robinson* at 4. If· there was confusion at Best regarding whether or not Best was operating under a contract or common carrier authority, Best should have applied to the ICC for a determination of its status under 49 U.S.C. § 10925(e) at the time the contract was entered into or executed.

The Trustee has focused at length on the shipper's/broker's failure to comply with the law of contract carriers and the Supreme Court's finding in *Maislin Indus., U.S., Inc. v. Primary Steel, Inc.* that when a carrier fails to file the rates it negotiated in a common carrier case, it is no excuse for a shipper to plead ignorance of this fact in an undercharge proceeding. 497 U.S. 116, 110 S.Ct. 2759, 111 L.Ed.2d 94 (1990) (holding that a defense to an undercharge claim in a negotiated rates case that is based upon the finding that the undercharge claim is an unreasonable practice is not valid). This Court cannot accept the Trustee's position because a dispute over carrier status is distinguishable from *Maislin,* a negotiated rates case. Based upon the ICC's overwhelming conclusion that both Best and Robinson intended and conducted themselves as having entered into a motor contract agreement, the *Maislin*

proposition that the shipper should have been aware of the filed rate doctrine is irrelevant because motor contract carriers do not file rates, so the doctrine would not have been a factor at the time the 1985 Agreement was effective.

Finally, the Trustee alleges that it was Robinson who did not meet the definition of having entered into a motor contract carrier relationship, and therefore, the relationship could only be one of common carriage. However, the Court agrees with the ICC that there exists no statutory authority for the ICC to retroactively void this contract and treat the agreement as a motor common carriage relationship based upon any actual or asserted deficiencies or breaches of the contract or performance thereunder. *See* *C.H. Robinson* at 8 (quoting *Ford v. Riss,* 9 I.C.C.2d at 895).

The 1985 Agreement satisfies the requirements for "motor contract carriage" that are located in 49 U.S.C. § 10102(15)(B)(ii). The ICC's decision in *C.H. Robinson* was a reasonable interpretation of the Interstate Commerce Act, and the ICC's exercise of authority in this case was within the bounds that Congress set in the Interstate Commerce Act.

The defendant's Motion for Summary Judgment is granted based upon review of the pleadings, the *C.H. Robinson* decision, and the accompanying briefs. This Court finds that the ICC was not acting arbitrarily or capriciously, but was acting reasonably and within its authority and therefore, the decision is entitled to deference by this Court.

Separate journal entry to be entered.