**ABERDEEN & ROCKFISH RAILROAD COMPANY & Other Railroads, Petitioners,**

v.

**The UNITED STATES of America and the Interstate Commerce Commission, Respondents.**

**NATIONAL MOTOR FREIGHT TRAFFIC ASSOCIATION, INC., Petitioner,**

v.

**The UNITED STATES of America and Interstate Commerce Commission, Respondents.**

Nos. 80–2099, 80–2327.

United States Court of Appeals, Fifth Circuit.

Aug. 9, 1982.

Rehearing and Rehearing En Banc Denied Sept. 22, 1982.

John J. Powers, III, James H. Laskey, Kenneth P. Kolson, U. S. Dept. of Justice, Evelyn G. Kitay, Atty., I. C. C., Washington, D. C., for respondents.

James E. Sykes, Chicago, Ill., for Western R. R. Ass'n.

James R. Paschall, Asst. Gen. Atty., Washington, D. C., for Southern Ry. System.

Albert B. Russ, Jr., Jacksonville, Fla., for Seaboard Coast Lines R. R.

Harry N. Babcock, Cleveland, Ohio, for Chessie System.

Rea, Cross & Auchincloss, Patrick McEligot, Bryce Rea, Jr., Washington, D. C., for National Motor Freight Traffic Ass'n, Inc.

Leonard A. Jaskiewicz, Washington, D. C., for Bulk Carrier Conference, Inc.

Before GARZA, POLITZ and WILLIAMS, Circuit Judges.

JERRE S. WILLIAMS, Circuit Judge:

Petitioners in these consolidated cases are the nation's railroads and the National Motor Freight Traffic Association (NMFTA), an organization composed of approximately 3,000 common motor carriers. We shall refer to petitioners collectively as "Carriers." The Carriers have sought review, pursuant to 28 U.S.C. §§ 2321(a), 2342(5), and 2344, of a portion of an order by the Interstate Commerce Commission (the Commission), Ex Parte No. 370, *Tariff Improvement* (June 10, 1981). As explained below, Ex Parte No. 370 introduced a new procedure for ensuring compliance with the Commission's tariff symbolization requirements. The Carriers contend that the Commission has exceeded its statutory authority under the Revised Interstate Commerce Act, 49 U.S.C. §§ 10761(a), 10762(b), and 10762(e), in adopting the new policy. They further maintained that the regulation devised to enforce the new policy is arbitrary and capricious, in contravention of the Administrative Procedure Act, 5 U.S.C. § 706(2)(A) & (C). Having reviewed the arguments and pertinent authorities, we conclude that the new regulation is both authorized by law and supported in the record.

I. Symbolization

The Revised Interstate Commerce Act (the Act) requires carriers providing transportation or service subject to the jurisdiction of the Commission to publish and file with that agency tariffs containing the rates that are charged to shippers. *See generally* 49 U.S.C. § 10762. Regulated carriers may collect only the rates that are contained in tariffs on file with the Commission, *see* 49 U.S.C. § 10761, and departure from the filed rate schedule will subject a carrier to civil and criminal liability, 49 U.S.C. §§ 11901, 11903. The Commission is empowered to prescribe the form and manner of publishing, filing, and keeping the tariffs open for public inspection. 49 U.S.C. § 10762(b)(1). However, the Act itself clearly states that newly filed tariffs must "plainly identify" any proposed rate change and indicate its proposed effective date. 49 U.S.C. § 10762(c)(3). Normally a new tariff will become effective thirty days or, in the case of railroads, twenty days, after the carrier files it, *id.*, unless the Commission suspends the proposed rate pending the outcome of an investigation pursuant to 49 U.S.C. § 10707(a) or § 10708(a).

As authorized by 49 U.S.C. § 10762(b)(1), the Commission has promulgated regulations prescribing the form in which tariffs are to be published and filed. One such regulation governs the symbolization of changed rates, requiring that

> [t]ariff publications shall indicate changes made in existing rates, charges, classifications, rules, or other provisions by use of the following uniform reference marks in connection with each such change:
>
> or (R) to denote reductions
>
> or (A) to denote increases
>
> or (C) to denote changes which result in neither increases nor reductions in charges

49 C.F.R. § 1310.10(f)(1). As justified by the Commission, these requirements "are designed to allow tariff users to rely on symbolization to (1) discover changes and (2) evaluate those changes. Discovery and evaluation are vital to tariff users' rights to timely protest proposed tariff changes." 44 Fed.Reg. 60123 (1979).

Until 1979, the Commission maintained a staff that examined every proposed tariff prior to its effective date in order to uncover obvious defects in publication, including symbolization errors. Tariffs submitted without the appropriate change-denoting symbols were rejected, pursuant to 49 U.S.C. § 10762(e), and the offending carrier then had to resubmit the proposed schedule in acceptable form. Apparently in the belief that few improperly symbolized tariffs would escape this scrutiny, the Commission never sought to exact any penalty for symbolization errors discovered after a tariff had gone into effect. Rather, it merely advised the carrier of its error and requested more caution in the future.

On October 18, 1979, however, the Commission published a Notice of Proposed Rulemaking reporting a change of policy. In an order docketed as Ex Parte No. 370, the Commission explained that budgetary constraints had forced it to abandon its comprehensive tariff examination service. Thenceforth, the Commission could review only a random sample of newly filed tariffs. Since increasing numbers of inadequately symbolized increases would go undetected, the agency had concluded that stiffer sanctions were in order:

> We believe it would be inappropriate for tariff users to be burdened with the onerous chore of comparing proposed tariff filings word-for-word or figure-for-figure against existing tariff matter. They should be able to rely on the accuracy of tariff symbolization. The rules proposed here would stipulate that improperly-symbolized changes which result in increases would be considered improperly published and thus invalid and uncollectable. This would offer retroactive protection to tariff users who had been effectively deprived of their right to protest by missymbolization.

44 Fed.Reg. 60123 (1979). The Notice proposed the following regulation for inclusion in the Code of Federal Regulations:

> Changes resulting in increases which are not identified by proper symbols shall be considered unlawfully published and filed and therefore invalid and not collectable. In such cases, the lawful provisions will be those which were purportedly superseded. Invalid provisions shall be cancelled by publications which shall bring forward, or properly amend, provisions which have remained in effect by reason of invalid publication.

The Notice declared further that "[c]harges assessed on the basis of the invalid provisions would be subject to the usual overcharge claim procedures." 44 Fed.Reg. 60124.[1]

Following the obligatory period in which it received comments and suggestions from interested parties, the Commission published its decision in Ex Parte No. 370, *Tariff Improvement* (August 14, 1980). Despite

---

1. *See generally* 49 U.S.C. § 11705. Subsection 11705(b)(1) provides that "[a] common carrier providing transportation or service subject to the jurisdiction of the Commission under Chapter 105 of this title is liable to a person for amounts charged that exceed the applicable rate for transportation or service contained in a tariff filed under Subchapter IV of Chapter 107 of this title."

the predictably unfavorable response from Carriers,[2] the Commission adopted the proposed rule without change. The decision explained that yearly increases in the number of published tariffs had combined with budgetary and personnel constraints to make the new policy imperative. As originally proposed, the new regulation was to apply only to improperly symbolized *increases,* since unnoticed rate raises pose the greatest threat to tariff users. The decision also made it clear that claims for overcharges accruing from publication of improperly symbolized—and therefore unlawful—tariffs could be filed at any time within the ordinary three-year limitation period prescribed by 49 U.S.C. § 11706(b).

The controversial regulation was duly codified at 49 C.F.R. §§ 1300.2(a)(4), 1303.-4(d)(3), 1304.2(c), 1306.5(b)(2), 1307.5(r)(1), 1308.2(a), and 1310.10(f)(5). Although it was scheduled to become effective on October 14, 1980, this Court granted a temporary stay of its operation and enforcement pending our review. The Commission subsequently denied several petitions for reconsideration of Ex Parte No. 370. *See* 365 I.C.C. 43 (1981).

## II. The Commission's Authority

### A. Standard of Review

■ In reviewing a decision of the Commission, "[w]e can ask only whether the Commission has observed the statutory limits that Congress has set for its discretion, whether its action was arbitrary or capricious, or whether its findings are supported by adequate analysis and substantial evidence in the record considered as a whole." *Missouri-Kansas-Texas Railroad v. United States,* 632 F.2d 392, 400 (5th Cir. 1980), *cert. denied,* 451 U.S. 1017, 101 S.Ct. 3004, 69 L.Ed.2d 388 (1981). *See* 5 U.S.C. § 706(2)(A), (C), (E). At the outset, then, we must determine whether the Commission has remained within the statutory bounds set forth in the Act. Statutory construction normally raises only questions

of law, which are freely reviewable *de novo* by the courts. *See Coca-Cola Co. v. Atchison, Topeka & Santa Fe Railway,* 608 F.2d 213, 218 (5th Cir. 1979). While courts must not shirk through inertia their responsibility as final authorities on matters of statutory interpretation, "[t]he construction put on a statute by the agency charged with administering it is entitled to deference by the courts, and ordinarily that construction will be affirmed if it has a 'reasonable basis in law.' " *Volkswagenwerk Aktiengesellschaft v. FMC,* 390 U.S. 261, 272, 88 S.Ct. 929, 935, 19 L.Ed.2d 1090 (1968). *See also Coca-Cola Co., supra,* 608 F.2d at 222 ("[E]ven when the issue is one of pure law, such as interpretation of contracts, tariffs, regulations, and statutes, room still is present for deference to the views of administrative agencies, particularly where the understanding of the problem is enhanced by the agency's expert understanding of the industry").

### B. Rejection of Tariffs

The Carriers insist that the proposed regulation exceeds the Commission's statutory authority in that it provides for retroactive rejection of tariffs and creates a private right of action on behalf of shippers who are not necessarily injured by a missymbolized increase. The new policy permits the retroactive voiding of otherwise reasonable rates, the argument continues, thereby allowing unharmed shippers to reap the windfall of up to three years in overcharges because of a printer's oversight. Of course, the contrast between a potentially major penalty and a potentially minor transgression does not lead inevitably to a conclusion that regulatory authority has been usurped. Therefore, the Carriers undertake a meticulous dissection of 49 U.S.C. § 10762(e) in support of their contention that the Act does not authorize rejection of a tariff already in effect.

Section 10762(e) provides that "[t]he Commission may reject a tariff submitted

---

**2.** The Commission reported in Ex Parte No. 370 that 52 parties, basically shippers, receivers, and their organizations, had responded favor-

ably; 38 parties, basically carriers and their organizations, were opposed.

to it by a common carrier under this section if that tariff violates this section or regulation of the Commission carrying out this section." The Carriers first seize upon the phrase "under this section," suggesting that since section 10762 generally governs the publishing and filing of *proposed* tariffs, the Commission can only reject a tariff submitted "under [that] section" while it is still proposed, *i.e.* ineffective. The argument is imaginative, but sophistic. Section 10762 does not confine itself to proposed tariffs; it prescribes general rules for the filing of tariffs, and they obviously must remain on file after going into effect. The section states when and how filed tariffs go into effect and requires that they remain open for inspection. Moreover, since section 10762 is the source of all tariff publication and filing requirements, any tariff, proposed or effective, must have been submitted to the Commission "under this section."

The Carriers next focus on the word "may" and submit that Congress intended for the rejection process to be discretionary, not mandatory. We fail to see how this lends any weight to the Carriers' position, however. Certainly the statute makes rejection of any tariff an act of discretion, but the Commission's election to reject *all* tariffs containing unsymbolized rate increases remains wholly authorized by this broad grant of discretion.

Third, the Carriers suggest that the word "reject" connotes an immediate refusal to accept a tariff rather than a reservation of power to discard it at any time. Insisting that the Commission cannot "reject" a tariff after it has gone into effect, petitioners cite the following language from *Delta Air Lines, Inc. v. CAB*, 543 F.2d 247, 268 (D.C. Cir.1976):

> Given the nature and purpose of the Board's rejection power under section 403, namely to prevent the filing of substantive nullities and tariffs suffering

from technical or formal deficiencies, it is obvious why the Act does not permit rejection, as opposed to investigation, after a tariff becomes effective. As Judge Leventhal explained in *Municipal Light Boards* [v. FPC, 450 F.2d 1341 (D.C.Cir. 1971)], rejection is a ' "peremptory form of response to filed tariffs" which classically is used not to dispose of a matter on the merits but rather as a technique for calling on the filing party to put its papers in proper form and order.' We find implicit in Judge Leventhal's description a recognition that rejection is a regulatory device properly used only *prior* to a tariff's effective date.

The Carrier's reliance upon *Delta Air Lines* as controlling precedent, however, founders upon crucial factual differences between that case, which construed a section of the Federal Aviation Act (FAA),[3] and the case before us.

In *Delta Air Lines*, the D.C. Circuit considered a challenge by several air carriers to five orders of the Civil Aeronautics Board (CAB). The CAB had relied on section 403 of the FAA,[4] a provision similar to section 10762 of the Revised Interstate Commerce Act, to reject the airlines' properly filed tariffs on the grounds that the tariffs— which propounded the airlines' policies on carriage of hazardous cargo—were inconsistent with applicable federal air safety regulations. The Court of Appeals held that the CAB had improperly relied on section 403, a provision designed solely to set forth the *procedural* prerequisites for filing a tariff, in order to cancel the tariffs on *substantive* grounds. The Court concluded that the CAB could only challenge such substantive defects in effective tariffs by proceeding against them under section 1002 of the FAA, which empowers the CAB to determine the lawfulness of a new tariff only after providing notice and a hearing.[5] As the Court explained:

---

**3.** 49 U.S.C. § 1301 et seq.

**4.** 49 U.S.C. § 1373.

**5.** Section 1002 of the FAA, 49 U.S.C. § 1482, governs "Complaints to and investigation by" the Administrator and the Civil Aeronautics Board. Its provision for suspension of a rate during an investigation into its lawfulness is

Under the circumstances of this case rejection was not an alternative available to the Board under the Act. Absent a technical or formal defect relating to the filing, posting, or publication of a tariff, or a substantive defect that renders the tariff a substantive nullity, the Board can prevent a new, proposed tariff from becoming effective only by *suspending* it for a maximum period of 180 days, pending a *hearing* on its lawfulness. Contrary to the Board's determination, in petitioners' proposed tariffs we find no substantive deficiencies warranting rejection under section 403.

543 F.2d at 261 (emphasis original).

By contrast, the symbolization errors that form the basis for tariff rejection under the Commission's new regulation belong precisely to the type of "technical or formal defect[s] relating to the filing, posting, or publication of a tariff" that the Court noted as appropriate for rejection under section 403 of the FAA. The requirement that rate increases be symbolized on a filed tariff is not "substantive;" it does not "raise difficult issues of economic cost and common carrier responsibility," see 543 F.2d at 247, that invariably require investigation and discussion as aids to a decision on the merits. It is merely a procedural regulation prescribing the form in which a tariff must be published and filed, and rejection is the remedy that agencies commonly are empowered to use against tariff filings that are obviously "defective in form." *See Municipal Light Boards v. FPC*, 450 F.2d 1341, 1364 (D.C.Cir.1971), *cert. denied*, 405 U.S. 989, 92 S.Ct. 1251, 31 L.Ed.2d 445 (1972), (quoted in *Delta Air Lines, supra*) (rejection "is appropriate where the filing is so deficient on its face that the agency may properly return it to the filing party without even awaiting a responsive filing by any other party in interest.").

Of course, the need for a symbol denoting a rate increase may not always be obvious. As petitioner NMFTA points out, *see* note 15, *infra*, ambiguities that arise during the process of amending rate classifications

may create uncertainty as to whether the rate for a particular commodity has gone up or down. However, the Commission's new regulation, unlike the CAB procedure struck down in *Delta Air Lines* does not provide for peremptory rejection without a hearing. On the contrary, the Commission has clearly stated that disputes concerning improperly symbolized tariffs are subject to the formal complaint procedures of 49 U.S.C. § 11701, which entitle a carrier charged with violating the Act to "notice of the investigation and an opportunity for a proceeding."

Fourth, and finally, the Carriers fall back on the familiar argument that Congress surely would have stated its intentions more clearly and vested a private right of enforcement in shippers had it meant for section 10762(e) to empower the Commission to void any tariff not in compliance with its "technical" requirements. This contention, at least as it bears upon the language of section 10762(e), is mystifying. Congress did create a private right of enforcement when it permitted shippers to sue "for amounts charged that exceed the applicable rate ... contained in a tariff filed under Subchapter IV of Chapter 107 of this title." 49 U.S.C. § 11705(b)(1). As we shall see in Part C, *infra*, the question becomes whether a tariff lacking the necessary symbol should be considered as having been so filed.

█ As for the Carriers' wish for a clearer statement of Congressional intent, we can only reiterate that section 10762(e) authorizes the Commission to "reject a tariff submitted to it by a common carrier under this section if that tariff violates this section or regulation of the Commission carrying out this section." Taken at face value, the statute would seem to empower the Commission to reject any tariff not in conformity with its regulations prescribing the form in which tariffs are to be filed. It mentions nothing about "proposed" or "ineffective" tariffs, nor does it place any time constraints on the power to reject. Turning

comparable to that of the Revised Interstate Commerce Act, 49 U.S.C. §§ 10707, 10708.

petitioners' guns around, one might suggest that Congress surely would have limited the reach of section 10762(e) to "ineffective" tariffs had it intended such a result.

Nothing in the language of section 10762(e), therefore, indicates that the Commission may not reject a tariff that has gone into effect but has not been filed in the prescribed format. Moreover, the precedents cited by the Carriers suggest that the appropriateness of rejection as a remedy for a regulatory violation depends more upon the type of error being corrected (*i.e.*, formal versus substantive) than upon the type of tariff being challenged (proposed versus effective). Missymbolization is a formal defect and an important one. Especially since the Commission intends to provide notice and a hearing on challenged tariffs,[6] we conclude that the Commission may reject improperly symbolized tariffs.

## C. Retroactive Voidance

Having reached the conclusion that the Commission may reject improperly symbolized tariffs, we must immediately concede to an impression that the Commission's power of rejection does not lie at the heart of this dispute.[7] The Carrier's own proposals for sanctions against symbolization errors—notably fines—indicate that their primary concern is not to escape all responsibility for their errors. If the Commission were seeking to reject improperly symbolized tariffs merely by imposing a fine or notifying the offending carrier that it could no longer collect on the defective tariff

until it filed a proper substitute, it appears likely that the Commission's power to reject such tariffs would have gone unchallenged. What deeply disturbs the Carriers is the potential for retroactive liability that accompanies rejection. Consequently, they insist that section 10762, however we construe its provision for rejection, certainly does not contemplate retroactive overcharge liability for rates which are reasonable but which were filed originally without the required symbol. To this argument we now turn.

As petitioners enthusiastically point out, the Commission's new policy announcing the retroactive invalidity of improperly published tariffs carrying with it the retroactive liability to shippers moves away from an impressive list of prior decisions by the Commission. Only recently the Eleventh Circuit, in reviewing a separate but very similar order by the Commission,[8] observed that "[i]n a long line of cases where shippers brought formal complaints of overcharge on grounds that the current tariff had been improperly established, the Commission held that the applicability of tariffs or rates does not depend upon strict compliance with the Commissions' publication rules." *Southern Motor Carriers Rate Conference v. United States*, 676 F.2d 1374 at 1379 (11th Cir. 1982) (amended opinion) (citations omitted).

 Yet, an agency's interpretations of practices under a statute are not carved in stone.

---

**6.** In *Southern Motor Carriers Rate Conference v. United States*, 676 F.2d 1374 (11th Cir. 1982) (amended opinion), the Court considered "whether § 10762(e) of the Interstate Commerce Act authorizes the Commission to reject or strike an effective tariff using the Tariff Integrity Board procedures." These procedures, announced in Ex Parte 367, *Tariff Integrity Board*, 49 Fed.Reg. 39558 (1979), provided for expeditious handling of disputes over whether a tariff had been filed without complying with the requirements of § 10762 or Commission regulations. The Eleventh Circuit concluded that the Act did not authorize rejection of effective tariffs through the informal proceedings proposed for use by the new Board. The Court expressly reserved, however, the issue of "whether through *formal* complaint pro-

cedures the Commission may strike a tariff retroactively for procedural publishing errors." At 1379 (emphasis added).

**7.** The Commission does not even rely upon subsection 10762(e) as primary authority for its new regulation, although it insists that a defective tariff may be rejected at any time. Rather, it falls back on its power under subsection 10762(b)(1) to "prescribe the form and manner of publishing, filing, and keeping tariffs open for public inspection," and a line of authorities, discussed *infra*, holding that any tariff not in compliance with these prescriptions is unlawful and voidable.

**8.** *See* Note 6, *supra*.

[T]he Commission, faced with new developments or in light of reconsideration of the relevant facts and its mandate, may alter its past interpretation and overturn past administrative rulings and practice.... [T]his kind of flexibility and adaptability to changing needs and patterns of transportation is an essential part of the office of a regulatory agency. Regulatory agencies do not establish rules of conduct to last forever; they are supposed, within the limits of the law and of fair and prudent administration, to adapt their rules and practices to the Nation's needs in a volatile, changing economy. They are neither required nor supposed to regulate the present and the future within the inflexible limits of yesterday.

*American Trucking Associations, Inc. v. Atchison, Topeka & Santa Fe Railway,* 387 U.S. 397, 416, 87 S.Ct. 1608, 1618, 18 L.Ed.2d 847 (1967). Of course, the flexibility permitted by this approach, does not permit us blithely to accommodate each new gloss placed by an agency upon its enabling legislation without troubling ourselves to inquire whether the revised interpretation, ruling, or practice remains plausibly within the authority conferred by statute. Our scrutiny of the Commission's new posture under section 10762, however, has led us to conclude that the challenged regulation is, if anything, more clearly authorized by the Act than was the Commission's former policy of denying overcharge liability for improperly symbolized tariffs.

*Shobe, Inc. v. Bowman Transportation, Inc.,* 350 I.C.C. 664 (1975), is the most recent in the line of cases cited in *Southern Motors, supra,* which state the Commission's former policy. The defendant carrier in *Shobe* published a tariff without the required symbol. When sued for overcharges by a shipper who had not discovered the defect in time to protest under the thirty-day rule, the carrier argued that mere publishing errors do not give rise to overcharge liability. The Administrative Law Judge (ALJ) disagreed, citing *Chicago, Milwaukee, St. Paul & Pacific Railroad v. Alouette Peat Products, Ltd.,* 253 F.2d 449 (9th Cir. 1957).

Since the *Alouette* Court had held that a carrier's violation of the thirty-day notice requirement rendered the change rate unlawful, void, and uncollectible, the ALJ reasoned that a carrier's violation of the Commission's publication requirements warranted the same penalty.

The Commission disagreed. It did not explain its refusal to impose retroactive liability for a defectively published tariff as an act of discretion, however. The Commission justified its policy by reading into the Act a curious distinction between *statutory* violations, for which the Act permitted retroactive voidance, and *regulatory* defects, for which it supposedly did not.

The distinction relied upon a subtle misreading of the Interstate Commerce Act as it read in 1975. Section 217 of the unrevised Act, 49 Stat. 560, then codified as 49 U.S.C. § 317, contained four subsections. Subsection 317(a) required the filing of tariffs, authorized the promulgation of publishing regulations, and authorized the Commission "to reject any tariff filed with it which is *not in consonance with this section* and with such regulations" (emphasis added). In short, it included rough counterparts to subsections 10762(a)(1), (a)(2), and (e) of the current codification. Subsection 317(c) contained the thirty-day notice requirement that now appears in subsection 10762(c)(3).

The Commission read the language italicized above as confining the rejection remedy to violations of "section" 317(a), which was, of course, actually a subsection. Having accomplished this semantic manuever, the opinion reasoned that while violations of the express "statutory" notice requirement set forth in subsection 317(c) justified the overcharge liability established in *Alouette,* that remedy could not be transplanted to the self-contained hothouse of "section" 317(a) and its "regulatory" offshoots. Dismissing the ALJ's assumption "that the symbolization rules are equivalent to the thirty-day notice requirement and thus that a change made in the absence of a proper symbol was void," the Commission explained that the *Alouette* court

found that the tariff, while not filed in conformity with the law, was nonetheless the applicable tariff, and the rates contained in the tariff had to be collected by the carrier and paid by the shipper. The decision thus did not hold that the tariff was void but, rather, that the rates were unlawful because not made effective in the proper manner. Moreover, the *Alouette* decision was based on a *statutory* violation for which there was no specific administrative remedy. The remedy for a regulatory violation, rejection by the Commission, is exclusive, as is the penalty: the voiding of the tariff.

350 I.C.C. at 670 (emphasis original).

The conclusion reached in *Shobe* is unsatisfactory for at least two reasons. First, the Commission lacked persuasiveness in arguing that rejection was a "specific administrative remedy" applicable only to violations of publication regulations issued pursuant to "section" 317(a). There is no reason to suppose that the phrase "in consonance with this section" referred to anything other than the entirety of section 317. Although we customarily refer to any fragment of a statute as a section—hence our prior reference to "section" 10762(e)—Congressional draftsmen must be more careful. Drafters of the Act were familiar with the distinction between a section and a subsection; [9] certainly they would have used the right word had they intended to restrict the possibility of rejection to the "regulatory" provisions authorized by the first paragraph of section 317.

■ The structure of the Revised Act supports this criticism of *Shobe*. Congress clearly intended the new codification to effect no substantive changes in the law.[10]

Yet the Commission's rejection authority under subsection 10762(e) of the Revised Act expressly extends to tariffs that violate "this section *or regulation of the Commission* carrying out this section" (emphasis added). In view of the presumptive continuity between the old and new codifications, then, the Commission has always had the authority to reject tariffs containing "regulatory" violations.

■ Second, *Alouette* itself drew no distinction between "statutory" and "regulatory" defects as grounds for holding a tariff unlawful and, therefore, retroactively actionable for overcharges. Rather, the court differentiated only between an "applicable" rate—that is, one that has been accepted and filed by the Commission and is, therefore, binding on both shippers and carriers—and a "lawful" rate—one filed in accordance with the Act. The Court noted that a shipper must always pay the applicable rate, but can recover overcharges if that rate proves to have been unlawful at the time of payment.

> While the acceptance for filing by the Commission of the rate makes that rate applicable, it in no way cures *any defect* which may be present either in the establishment or the reasonableness of the rate.... A rate which is in fact unreasonable is not made reasonable by the mere act of filing, nor does the mere act of filing make lawful a publication *not made in accordance with the provisions of the Act.* Filing does not constitute publication, or cure a defective publication.

253 F.2d at 455–56 (emphasis added).[11]

■ Nothing in the Commission's contrary pronouncements prior to 1978, and

---

9. *See, e.g.,* § 218(a) of the unrevised codification, 49 Stat. 561, which specifically provided "for relief from the provisions of this subsection...."

10. *See* H.R.Rep. No. 95–1395, 95th Cong., 2d Sess. 9, *reprinted in* [1978] U.S.Code Cong. & Admin.News 3009, 3018. *See also* note 14 *infra* and accompanying text.

11. The applicable/lawful distinction also is important to an understanding of why the Carriers err in suggesting that the new regulation

undermines the "filed rate doctrine." The filed rate doctrine "forbids a regulated entity from charging rates for its services other than those properly filed with the appropriate federal regulatory authority." *Arkansas Louisiana Gas Co. v. Hall,* 453 U.S. 571, 101 S.Ct. 2925, 2930, 69 L.Ed.2d 856 (1981). *See also Lowden v. Simonds-Shields-Lonsdale Grain Company,* 306 U.S. 516, 520–21, 59 S.Ct. 612, 614, 83 L.Ed. 953 (1939). Originally devised as a means of ending discriminatory rebate practices, the doctrine binds both carriers and shippers to pay

certainly nothing in *Alouette*, convinces us that a tariff not in accordance with the publication regulations authorized under section 10762(b)(1) of the Revised Act is any less "unlawful" than one published in contravention of section 10762(c)(3)'s notice requirement. The logic behind *Alouette* is that a tariff not filed and published in accordance with statutory or regulatory provisions is not lawfully on file with the Commission.[12] Just because the Commission does not immediately notice the defect and accepts the defective tariff does not mean that the tariff, through this mischance, becomes lawful.[13]

■ Perhaps the best expression of the applicable/lawful distinction occurs in a comparatively recent decision of the Commission, *H. J. Baker Bros., Inc.—Statute of Limitations*, 357 I.C.C. 640 (1978). In *H. J. Baker Bros.*, the carrier had charged an excessive rate, violated the thirty-day notice requirement, *and* failed to symbolize the rate increase. Finding overcharge claims to be the appropriate remedy, the Commission explained as follows:

> The tariffs on file, although unlawful, specified the applicable rate which the shippers were bound to pay, pursuant to

the act. The act requires strict observance of the tariff regardless of the inherent unlawfulness of the rates specified. However, when and if the rates are shown to be unlawful *for any reason*, shippers are entitled to recover the difference between what they paid under the applicable tariff, and what is subsequently determined to be the lawful rate. Since the applicable rate cannot be deemed the lawful rate merely by virtue of being on file with the Commission, the argument of the Canadian railroads that the rates assessed were the lawful rates is without merit....

> ... *Rates and charges unlawfully established whether in the method of filing or contrary to specific commission orders are not due the carrier.*

375 I.C.C. at 644–45 (emphasis added). We conclude that tariffs not exhibiting the required symbols are not "lawfully on file." In turn, shippers may recover what has been paid pursuant to tariffs not "lawfully on file" because such charges are not "due the carrier."

■ One difficulty remains. The cases we have cited on this point relied on the

---

only the rate on file in the current tariff, *i.e.* what has been described above as the "applicable" rate. However, as the Court explained in *Middlewest Motor Freight Bureau v. United States*, 433 F.2d 212, 238 (8th Cir. 1970), *cert. denied*, 402 U.S. 999, 91 S.Ct. 2169, 29 L.Ed.2d 165 (1971), the doctrine creates a right to collect, but not a right to retain, unlawful charges.

> A rate which is filed with the Commission is not *ipso facto* a lawful rate. It is the *applicable* rate which the carrier must, under the compulsion of § 317(b), charge to shippers in the regular course of business. The reason for the requirement is plain. Requiring payment of rates according to published tariffs without question reduces the possibility that carriers will prefer some shippers over others, keeps interstate traffic flowing speedily without interruptions for on-the-spot disputes over rates, and encourages the channeling of those rate disputes that do arise to the Commission and the courts for adjudication. *But merely because the carrier is bound to charge the filed rate, it does not follow that he is necessarily entitled to keep it.*

(Emphasis added). Thus, the Commission does not disturb the filed rate doctrine when it re-

quires carriers to repay overcharges collected on the basis of improperly filed tariffs.

12. *See Axinn & Sons Lumber Co. v. Long Island Railroad*, 466 F.Supp. 993, 996–97 (E.D.N.Y.1978) (following *Alouette*).

13. In *Acme Fast Freight, Inc. Common Carrier* application, 17 M.C.C. 549, 556–57 (1939), sustained, 30 F.Supp. 968 (S.D.N.Y.1940), *aff'd*, 309 U.S. 638, 60 S.Ct. 810, 84 L.Ed. 993 (1940), the Commission observed:

> If tariffs are unlawful ... they may not lawfully be used [and] have no proper place in our files. If we are not bound to accept them and if we should accept them upon misapprehension, or inadvertently without examination or without determination as to whether they are proper subjects for filing, we may later reject them and strike them from our files.

As the Eleventh Circuit pointed out in *Southern Motor Carriers, supra,* at 1379, the Commission struck the tariff involved in *Acme Freight* for jurisdictional rather than procedural reasons. The reasoning behind the Commission's statement, however, remains pertinent here.

definition of "overcharges" contained in the pre-1978 version of the Act. Section 16(3)(g) of the unrevised statute described overcharges as "charges for transportation services in excess of those applicable thereto under the tariffs lawfully on file with the Commission." Obviously, this wording gave rise to the construction, developed in *Alouette* and *H. J. Baker Bros.*, that a rate must be both "applicable" *and* included in a tariff "lawfully on file" in order to be fully collectible. Section 11705(b)(1) of the Revised Act, however, replaced section 16(3)(g) with the following wording:

> A common carrier providing transportation or service subject to the jurisdiction of the Commission under Chapter 105 of this title is liable to a person for amounts charged that exceed the applicable rate for transportation or service contained in a tariff filed under Subchapter IV of Chapter 107 of this title.

In eliminating the words "lawfully on file with the Commission," did Congress purposefully extinguish the applicable/lawful distinction discussed above?

We are convinced that it did not. First, the legislative history of the Revised Act clearly states that the 1978 revisions wrought no substantive change in the law:

> Like other codifications undertaken to enact into positive law all titles of the United States Code, this bill makes no substantive change in the law. It is sometimes feared that mere changes in terminology and style will result in changes in substance or impair the precedent value of earlier judicial decisions and other interpretations. This fear might have some weight if this were the usual kind of amendatory legislation where it can be inferred that a change of language is intended to change substance. In a codification statute, however, the courts uphold the contrary presumption: the statute is intended to remain substantively unchanged.

H.R.Rep. No. 95–1395, 95th Cong., 2d Sess. 9, *reprinted in* [1978] U.S.Code Cong. & Admin.News 3009, 3018.[14]

Moreover, the revised wording still creates overcharge liability for charges that exceed the rate "contained in a tariff filed under Subchapter IV of Chapter 107 of this title." Since a well accepted meaning of "under" as used in legal writings is "in accordance with", section 11705(b)(1) remains subject to the interpretation that a rate increase is not collectible unless it appears in a tariff filed in accordance with section 10762 (which is part of Subchapter IV, Chapter 107) and the regulations authorized by subsection 10762(b)(1).

### III. Is the Regulation Arbitrary?

■ The Carriers argue that the Commission's action in adopting the proposed regulation is unlawful, even if authorized by statute, because it is arbitrary and capricious. Before considering this challenge to the reasoning that underlies the Commission's decision, we note that the "arbitrary and capricious" standard is highly deferential and forbids a court from substituting its judgment for that of an agency. *Environmental Defense Fund, Inc. v. Costle,* 657 F.2d 275, 283 (D.C.Cir.1981). "If the agency considers the relevant factors and articulates a rational connection between the facts found and the choice made, the decision is not arbitrary or capricious." *Watkins Motor Lines, Inc. v. I.C.C.,* 641 F.2d 1183, 1188 (5th Cir. 1981). *See also City of Houston v. FAA,* 679 F.2d 1184 at 1189–90 (5th Cir. 1982).

Briefly, the Carriers contend that the new regulation is arbitrary and capricious because it is unnecessarily harsh when viewed against its objectives. They submit that rate symbols are mere technicalities and that shippers are likely to learn about increases through prefiling notices or new filings even without the required symbols. Thus, while perhaps useful, symbols are not of sufficient importance to justify extensive penalties for carriers who erroneously omit

---

**14.** *See also Fourco Glass Co. v. Transmirra Products Corp.,* 353 U.S. 222, 227, 77 S.Ct. 787, 791, 1 L.Ed.2d 786 (1957) ("[I]t will not be inferred that Congress, in revising and consolidating the laws, intended to change their effect, unless such intention is clearly expressed.").

them. Certainly, the Carriers insist, the sanction adopted by the Commission—retroactive overcharge liability with a three-year statute of limitations—is out of all proportion to the seriousness of such omissions. An unscrupulous shipper lucky enough to detect an unsymbolized increase could sit on his discovery for three years and collect the windfall of a massive overcharge judgment. This is particularly capricious, the Carriers continue, since the shipper is not even required to show injury: in other words, an otherwise reasonable increase may be declared retroactively invalid up to three years after going into effect just because the carrier neglected to symbolize it. Finally, the NMFTA, which publishes the National Motor Freight Classification, complains particularly that the new regulation is arbitrary and capricious because it fails to make concessions for unavoidable errors that occur whenever a new (or newly amended) rate classification creates a dispute over which rate applies to a certain commodity.[15]

The Commission replies that efficient symbolization is crucial to tariff users' right to lodge timely protests against proposed rate changes. Since the Commission can no longer afford to police the thousands of rate changes that are published weekly, it must shift the burden of ensuring exact compliance with symbolization requirements to the carriers themselves. It has concluded that the best means of compelling carriers to assume this burden is to adopt the new policy under which unsymbolized rate increases are considered unlawful and, therefore, void *ab initio.* The threat of substantial liability is the surest

means of encouraging thorough compliance. No carrier need ever repay an overcharge, after all, if it exercises care to symbolize its rate increases as required. In defense of the three-year limitations period, the Commission points out that this is merely the time limit mandated by 49 U.S.C. § 11706(b) for any civil action to recover overcharges under § 11705(b)(1). As for the uncertainties predicted by NMFTA, the Commission responds that tariff publishers who are uncertain of a new or amended classification's ultimate effect on rates can apply to the Commission for a waiver of the symbolization requirement. Moreover, the Commission points out that it retains sufficient discretion under the new regulation to take account of special cases in determining liability.

Admittedly, the petitioners have voiced robust objections to the new regulation. Allowing shippers three years in which to file a claim for overcharges based on a symbolization error is a potentially harsh remedy. Also of concern is the absence of any injury-in-fact prerequisite to such a claim. Shippers who could not possibly have challenged a newly-filed rate increase as unreasonable may be able to secure its subsequent revocation simply because they did not have the opportunity to offer a futile protest. Moreover, a shipper with actual notice of the increase can seek damages for the absence of a symbol whose purpose is to provide notice.

■■■ These problems reflect severity, however, not caprice. The Commission has provided a rational explanation for its decision. Pleading necessity, the Commission

---

**15.** The National Motor Freight Classification is a catalogue of products grouped according to the similarity of their rates. As described by the Supreme Court in *Director General of Railroads v. Viscose Co.,* 254 U.S. 498, 503, 41 S.Ct. 151, 153, 65 L.Ed. 372 (1921),

> [c]lassification in carrier ratemaking practice is grouping—the associating in a designated list, commodities, which, because of their inherent quality or value, or of the risks involved in shipment, or because of the manner or volume in which they are shipped or loaded, and the like, may justly and conveniently be given similar rates.

The Classification is a tariff and must comply with the Commission's symbolization rules.

The comments on proposed rulemaking submitted by NMFTA suggested that the new rule may impose substantial liability for symbolization errors that are inevitable. According to NMFTA, amendments to a classification may change the descriptive wording, thereby creating uncertainty as to which classification (and which rate) covers a particular product. Until this matter is settled, it may be impossible to determine whether the rate for that commodity has been lowered, been increased, or remained unchanged.

has opted for what comes down to a rule of strict liability for noncompliance with its symbolization regulations. Having persuasively described the necessity of shifting monitorial duties to the carriers themselves, where the ultimate legal responsibility always has lain, the Commission is not unreasonable in concluding that overcharge liability is the most appropriate means of encouraging the carriers to check and recheck thoroughly all tariff revisions. The predicted decline in intentional or negligent symbolization errors compensates, at least arguably, for the possibility of recovery by an unharmed shipper. After all, it is clear that a carrier is not *entitled* to a rate increase, just or otherwise, that has not been filed in the prescribed manner. Moreover, the Commission is correct in pointing out that the carriers can prevent windfall recoveries simply by carefully carrying out their own legal obligation to mark their rate increases.

 The need is clear for a symbol to indicate rate increases which are part of long and detailed rate schedules. The ordering of a refund for overcharges remains discretionary, however, and the Commission retains the right to fashion relief appropriate to individual circumstances.[16] Thus, with regard to petitioner NMFTA's particular objections, we do not strike down a rule as arbitrary and capricious on the basis of a suggestion that the agency might, in hypothetical situations, administer it arbitrarily and capriciously. Virtually every new regulation, no matter how easily and fairly it may work in the majority of cases, carries the possibility of an arbitrary adjudication in some future circumstance. The Commission has clearly stated that it will take action on a symbolization error only after providing notice and a hearing pursuant to 49 U.S.C. § 11701. In the concrete disputes that arise under this procedure, the Commission undoubtedly will encounter situations in which the duty to symbolize a rate as "increased" was not apparent at the time of filing. If, as the result of some future

adjudication, a carrier believes that the Commission has arbitrarily struck down a tariff because of a symbolization error that was truly unavoidable, the carrier may petition for judicial review of the Commission's order on that basis. *See* 28 U.S.C. §§ 2321(a), 2342(5).

We conclude that the challenged regulation is authorized by §§ 10762(b)(1), 10762(e), and 11705(b)(1), and that the Commission's decision to exercise this authority was, in view of the facts described and reasons submitted, neither arbitrary nor capricious.

Stay VACATED and Petitions for Review DENIED.

---

16. *See, e.g., Genstar Chemical Ltd. v. ICC*, 665 F.2d 1304, 1309–10 (D.C.Cir.1981), *cert. denied,*

—— U.S. ——, 102 S.Ct. 1750, 72 L.Ed.2d 161 (1982).